# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP614-LV & 2019AP622 |

| | |
|---|---|
| COMPLETE TITLE: | Service Employees International Union (SEIU), Local 1, SEIU Healthcare Wisconsin, Milwaukee Area Service and Hospitality Workers, AFT-Wisconsin, Wisconsin Federation of Nurses and Health Professionals, Ramon Argandona, Peter Rickman, Amicar Zapata, Kim Kohlhaas, Jeffrey Myers, Andrew Felt, Candice Owley, Connie Smith and Janet Bewley, |
| |        Plaintiffs-Respondents, |
| |    v. |
| | Robin Vos, in his official capacity as Wisconsin Assembly Speaker, Roger Roth, in his official capacity as Wisconsin Senate President, Jim Steineke, in his official capacity as Wisconsin Assembly Majority Leader and Scott Fitzgerald, in his official capacity as Wisconsin Senate Majority Leader, |
| |        Defendants-Appellants, |
| | Josh Kaul, in his official capacity as Attorney General of the State of Wisconsin and Tony Evers, in his official capacity as Governor of the State of Wisconsin, |
| |        Defendants-Respondents. |

REVIEW OF AN ORDER OF THE COURT OF APPEALS
(2019 – unpublished)

| | |
|---|---|
| OPINION FILED: | July 9, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 18, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dane |
|   JUDGE: | Frank D. Remington |

| | |
|---|---|
| JUSTICES: | |

The opinion of the court is being announced in two writings. HAGEDORN, J., delivered a majority opinion of the Court addressing all issues other than the provisions of 2017 Wis. Act 369 concerning guidance documents.  This is a majority opinion of the Court with respect to Part II.E.2.-4., in which all Justices joined; and a majority opinion of the Court with respect to Parts I, II.A.-D., II.E.1., and III, in which ROGGENSACK, C.J., ZIEGLER, REBECCA GRASSL BRADLEY, and KELLY, JJ., joined.  KELLY, J., delivered a majority opinion of the Court with respect to the provisions of 2017 Wis. Act 369 concerning guidance documents, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and DALLET, JJ., joined.  ROGGENSACK, C.J., filed an opinion concurring in part and dissenting in part. DALLET, J., filed an opinion concurring in part and dissenting in part, in which ANN WALSH BRADLEY, J., joined. HAGEDORN, J., filed an opinion concurring in part and dissenting in part, in which ZIEGLER, J., joined.

NOT PARTICIPATING:

---

ATTORNEYS:

For the defendants-appellants, there were briefs filed by *Misha Tseytlin* and *Troutman Sanders LLP,* Chicago, Illinois, and *Eric M. McLeod, Lisa M. Lawless* and *Husch Blackwell LLP*, Madison. There was an oral argument by *Misha Tseytlin*.

For the plaintiffs-respondents, there was a brief filed by *Nicole G. Berner, Claire Prestel, John M. D'Elia* and *Service Employees International Union,* Washington, D.C.; *Timothy E. Hawks, Barbara Z. Quindel* and *Hawks Quindel, S.C.,* Milwaukee; *Jeremy P. Levinson, Stacie H. Rosenzweig* and *Halling & Cayo, S.C.,* Milwaukee; *David Strom* and *American Federation of Teachers,* Washington, D.C.; and *Matthew Wessler* and *Gupta Wessler PLLC, Washington, D.C.*  There was an oral argument by *Matthew Wessler*.

For the defendants-respondents, there were briefs filed by *Lester A. Pines*, *Tamara B. Packard*, *Christa O. Westerberg*, *Leslie A. Freehill*, *Beauregard W. Patterson* and *Pines Bach LLP*, Madison; *Joshua L. Kaul*, attorney general, *Thomas C. Bellavia*,

2

assistant attorney general and *Colin T. Roth*, assistant attorney general. There was an oral argument by *Joshua L. Kaul* and *Lester A. Pines*.

An amicus curiae brief was filed on behalf of Wisconsin Law and Liberty, Inc. by *Richard M. Esenberg*, *CJ Szafir*, *Lucas T. Vebber* and *Anthony LoCoco*, Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Manufacturers & Commerce by *Corydon J. Fish*, Madison.

No.  2019AP614-LV & 2019AP622
(L.C. No.  2019CV302)

STATE OF WISCONSIN         :    IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**Service Employees International Union (SEIU), Local 1, SEIU Healthcare Wisconsin, Milwaukee Area Service and Hospitality Workers, AFT-Wisconsin, Wisconsin Federation of Nurses and Health Professionals, Ramon Argandona, Peter Rickman, Amicar Zapata, Kim Kohlhaas, Jeffrey Myers, Andrew Felt, Candice Owley, Connie Smith and Janet Bewley,**

      **Plaintiffs-Respondents,**

   **v.**

**Robin Vos, in his official capacity as Wisconsin Assembly Speaker, Roger Roth, in his official capacity as Wisconsin Senate President, Jim Steineke, in his official capacity as Wisconsin Assembly Majority Leader and Scott Fitzgerald, in his official capacity as Wisconsin Senate Majority Leader,**

      **Defendants-Appellants,**

**Josh Kaul, in his official capacity as Attorney General of the State of Wisconsin and Tony Evers, in his official capacity as Governor of the State of Wisconsin,**

      **Defendants-Respondents.**

**FILED**

**JUL 9, 2020**

Sheila T. Reiff
Clerk of Supreme Court

The opinion of the court is being announced in two writings. HAGEDORN, J., delivered a majority opinion of the Court addressing all issues other than the provisions of 2017 Wis. Act 369 concerning guidance documents.  This is a majority opinion of the Court with respect to Part II.E.2.-4., in which all Justices joined; and a majority opinion of the Court with respect to Parts I, II.A.-D., II.E.1., and III, in which ROGGENSACK, C.J., ZIEGLER, REBECCA GRASSL BRADLEY, and KELLY, JJ., joined.  KELLY, J., delivered a majority opinion of the Court with respect to the provisions of 2017 Wis. Act 369 concerning guidance documents, in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and DALLET, JJ., joined.  ROGGENSACK, C.J., filed an opinion concurring in part and dissenting in part. DALLET, J., filed an opinion concurring in part and dissenting in part, in which ANN WALSH BRADLEY, J., joined. HAGEDORN, J., filed an opinion concurring in part and dissenting in part, in which ZIEGLER, J., joined.

---

APPEAL from an order of the Circuit Court of Dane County, Frank D. Remington, Circuit Court Judge.  *Affirmed in part, reversed in part, injunction vacated in part, cause remanded.*

¶1    BRIAN HAGEDORN, J.    Under our constitutional order, government derives its power solely from the people.  Government actors, therefore, only have the power the people consent to give them.    The Wisconsin Constitution is the authorizing charter for government power in Wisconsin.    And that document describes three——and only three——types of government power: legislative, executive, and judicial.  See Wis. Const. art. IV, § 1; id. art. V, § 1; id. art. VII, § 2.  Legislative power is the power to make the law, to decide what the law should be. Executive power is power to execute or enforce the law as

2

enacted.  And judicial power is the power to interpret and apply the law to disputes between parties.

¶2  The constitution then provides that each type of power is "vested" in a corresponding branch of government.  The legislative power is vested in two elected bodies——the senate and the assembly.  Id. art. IV, § 1.  The executive power is vested in the governor.  Id. art. V, § 1.  And the judicial power——being exercised in this very writing——is vested in a "unified court system" headed by the supreme court.  Id. art. VII, §§ 2-3.  With some exceptions, the general rule is that this diffusion of power into three separate branches creates a concomitant separation of powers requiring each branch to exercise only the power vested in it by the people of Wisconsin.

¶3  This case arises from enactment of 2017 Wis. Act 369 and 2017 Wis. Act 370.  These acts were passed by the legislature and signed by the governor following the 2018 election, but before the newly elected legislature, governor, and attorney general were sworn into office.  In response, several labor organizations and individual taxpayers (the Plaintiffs) filed suit against the leaders of both houses of the legislature (the Legislative Defendants), the Governor, and the Attorney General.  The Plaintiffs broadly claimed that many of the enacted provisions violate the separation of powers.  In particular, the Plaintiffs argued these new laws either overly burden the executive branch or took executive power and gave it to the legislature.

¶4 The complaint unequivocally presents a facial attack on all the laws challenged. That is, the Plaintiffs seek to strike down application of the challenged laws in their entirety, rather than as applied to a given party or set of circumstances. Briefing below and to this court confirms this. By presenting their challenge this way, the Plaintiffs face a tall task. Under our well-established law, a facial challenge succeeds only when every single application of a challenged provision is unconstitutional.

¶5 The procedural history is a bit complicated, but in short, the Legislative Defendants moved to dismiss the entire complaint, which the circuit court denied in full. In the same order, the circuit court granted a temporary injunction against enforcement of some of the provisions, most notably, laws requiring legislative approval of settlements by the attorney general, a provision allowing multiple suspensions of administrative rules, and a set of statutes defining and regulating administrative agency communications called "guidance documents." We took jurisdiction of this case, and therefore review the circuit court's denial of the motion to dismiss and its partial grant of a temporary injunction.

¶6 The court's opinion in this case is being announced in two writings. Justice Kelly's opinion constitutes the majority opinion of the court on all of the guidance document provisions. This writing constitutes the majority opinion of the court on all other issues raised in this case.

4

¶7 In light of the procedural posture of this case and the briefing before us, our analysis in this opinion rests on our review of the circuit court's denial of the Legislative Defendants' motion to dismiss. Our task is to determine whether the complaint states a valid legal claim against the challenged laws assuming the allegations in the complaint are true. Accordingly, this is purely a question of law and requires no factual development. See infra, ¶26.

¶8 While the Legislative Defendants moved to dismiss the entire complaint, they have not sufficiently briefed or developed arguments regarding several challenged provisions. Where the party seeking dismissal has not developed arguments on a legal issue, we will not develop arguments for them. See infra, ¶24. Therefore, we offer no opinion on the merits of these undeveloped claims——none of which were enjoined by the circuit court——and they may proceed in the ordinary course of litigation on remand.

¶9 All of the enjoined claims, as well as several other related claims, were sufficiently briefed and argued. We conclude that with respect to each of these claims, other than those separately addressed in Justice Kelly's opinion for the court, the Plaintiffs have not met their high burden to demonstrate that the challenged provisions are unconstitutional in all of their applications. Each of these provisions can be lawfully enforced as enacted in at least some circumstances. Accordingly, the motion to dismiss the facial challenges to these claims should have been granted. This therefore means the

temporary injunction is vacated in full except as otherwise instructed in Justice Kelly's opinion for the court.

¶10 Specifically, the provisions regarding legislative involvement in litigation through intervention and settlement approval authority in certain cases prosecuted or defended by the attorney general are facially constitutional. The legislature may have an institutional interest in litigation implicating the public purse or in cases arising from its statutorily granted right to request the attorney general's participation in litigation. These institutional interests are sufficient to allow at least some constitutional applications of these laws, and the facial challenge asking us to declare the laws unenforceable under any circumstances necessarily fails.

¶11 In a similar vein, the provision permitting legislative committee review of any proposed changes to security at the State Capitol has at least some constitutional applications with respect to security of legislative space. It follows that a facial challenge to this provision must fail.

¶12 Likewise, the provision allowing multiple suspensions of administrative rules plainly has constitutional applications under Martinez v. DILHR, where we held that one three-month suspension is constitutionally permissible. 165 Wis. 2d 687, 702, 478 N.W.2d 582 (1992). No party asks us to revisit Martinez or its principles. We conclude that if one three-month suspension passes constitutional muster, two three-month suspensions surely does as well. Therefore, the facial challenge to this provision fails.

¶13 Finally, the provision partially codifying our holding in Tetra Tech is also clearly constitutional in many, if not all, applications. Tetra Tech EC, Inc. v. DOR, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21. The facial challenge to this provision cannot survive.

¶14 With this summary in view, our analysis begins with how we got here.

## I. BACKGROUND

¶15 In December 2018, both houses of the Wisconsin legislature passed and the governor signed into law 2017 Wis. Act 369 and 2017 Wis. Act 370. The specific provisions challenged——because there are many——will be discussed in more detail below. For now, we give a high-level overview of the somewhat complicated procedural posture.

¶16 Two months after Act 369 and Act 370 became law——and after the new legislature, governor, and attorney general were sworn in——the Plaintiffs brought the complaint underlying this appeal in Dane County Circuit Court.[1] They sued the Legislative

---

[1] The Plaintiffs are: Service Employees International Union (SEIU), Local 1; SEIU Healthcare Wisconsin; Milwaukee Area Service and Hospital Workers; AFT-Wisconsin; Wisconsin Federation of Nurses and Health Professionals; Ramon Argandona; Peter Rickman; Amicar Zapata; Kim Kohlhaas; Jeffrey Myers; Andrew Felt; Candice Owley; Connie Smith; and Janet Bewley.

The Honorable Frank D. Remington, Dane County Circuit Court, presided.

Defendants,[2] Attorney General Josh Kaul, and Governor Tony Evers——all in their official capacities. The complaint sought declaratory and injunctive relief from enforcement of numerous provisions of these acts. Concurrent with the filing of their complaint, the Plaintiffs also moved for a temporary injunction.[3]

¶17 The Legislative Defendants responded with a motion to dismiss the entire complaint, arguing all challenged provisions were consistent with the Wisconsin Constitution.

¶18 Although a defendant in his official capacity, the Governor supported the Plaintiffs' arguments and took them a step further. The Governor brought his own motion for a temporary injunction seeking to enjoin additional provisions not raised in the Plaintiffs' temporary injunction motion.[4] The Governor also filed a cross-claim joining the complaint in full

---

[2] The Legislative Defendants, all sued in their official capacities, are: Wisconsin Assembly Speaker Robin Vos; Wisconsin Senate President Roger Roth; Wisconsin Assembly Majority Leader Jim Steineke; and Wisconsin Senate Majority Leader Scott Fitzgerald.

[3] The Plaintiffs' motion was styled as a request for a temporary restraining order; however, the circuit court, by agreement of the parties, construed the motion as one for a temporary injunction.

[4] The Governor's motion was similarly titled a motion for a temporary restraining order and construed as a motion for a temporary injunction.

and requesting his own declaratory and injunctive relief with respect to the additional provisions he sought to enjoin.[5]

¶19 The Attorney General was also sued in his official capacity, but did not render a substantive defense of the laws. Rather, the Attorney General largely supported the Plaintiffs, and asked the circuit court to strike down multiple laws impacting his authority.

¶20 On March 25, 2019, the circuit court heard arguments on all pending motions, and it provided its decision and order the following day. The circuit court denied in full the Legislative Defendants' motion to dismiss the complaint. It also granted the motions for temporary injunction in part and denied them in part. The laws enjoined concern legislative involvement in state-related litigation; the ability of the Joint Committee for Review of Administrative Rules to suspend an administrative rule multiple times; and various provisions

---

[5] We observe that the Governor, who was sued in his official, not personal, capacity, signed these bills into law. We leave for another day whether the governor of Wisconsin may sue the legislature over laws that the legislature passed, and here, ones the governor himself in his official capacity signed into law. We also leave for another day whether the legislature may be sued by the governor for passing laws the governor at some point thereafter believes are inconsistent with the constitution.

regarding a newly defined category of agency communications called guidance documents.[6]

¶21 The Legislative Defendants then sought appellate review of both the denial of the motion to dismiss and the order granting injunctive relief.[7] On April 19, 2019, this court assumed jurisdiction over the appeal of the temporary injunction. And on June 11, 2019, we assumed jurisdiction over and granted the Legislative Defendants' interlocutory appeal of the denial of the motion to dismiss. On the same date, we issued an order imposing a stay on the temporary injunction issued by the circuit court with respect to all but one provision.[8]

---

[6] The circuit court enjoined the following sections: 2017 Wis. Act 369, § 26 (Wis. Stat. § 165.08(1) (2017-18)); § 30 (Wis. Stat. § 165.25(6)(a)1.); § 31 (Wis. Stat. § 227.01(3m)); § 33 (Wis. Stat. § 227.05); § 38 (Wis. Stat. § 227.112); § 64 (Wis. Stat. § 227.26(2)(im)); § 65 (Wis. Stat. § 227.40(1)); § 66 (Wis. Stat. § 227.40(2)(intro.)); § 67 (Wis. Stat. § 227.40(2)(e)); § 68 (Wis. Stat. § 227.40(3)(ag)); § 69 (Wis. Stat. § 227.40(3)(ar)); § 70 (Wis. Stat. § 227.40(3)(b) & (c)); § 71 (Wis. Stat. § 227.40(4)(a)); and §§ 104-05.

All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[7] Originally, the Legislative Defendants filed one appeal requesting review of both the denial of the motion to dismiss and the order granting injunctive relief. However, this appeal was split into two separate appeals——No. 2019AP622 is the appeal as of right from the temporary injunction while No. 2019AP614-LV is the petition for leave to file an interlocutory appeal from the circuit court's denial of the motion to dismiss.

[8] We did not stay the circuit court's temporary injunction of 2017 Wis. Act 369, § 38 with respect to Wis. Stat. § 227.112(7)(a).

## II. DISCUSSION

### A. Scope of Review

¶22 Because of the procedural posture of this case, we have two categories of claims before us. The first category comprises claims raised by the Plaintiffs in their complaint and challenged by the Legislative Defendants' in their motion to dismiss the entire complaint. Some of these were enjoined by the circuit court, some were not. But the motion to dismiss, which includes all issues raised in the complaint, is before us on review.

¶23 The second category of claims are new issues raised in the Governor's cross-claim and in the Governor's motion for a temporary injunction. These are, with one exception, not properly before us on review. The exception is 2017 Wis. Act 369, § 33 (Wis. Stat. § 227.05), a guidance document provision addressed in Justice Kelly's opinion for the court.

¶24 Although the Legislative Defendants seek dismissal of the entire complaint, several provisions challenged by the Plaintiffs either were not argued at all or were only perfunctorily raised in briefing before us. We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case. State v. Pal, 2017 WI 44, ¶26, 374 Wis. 2d 759, 893 N.W.2d 848. If they fail to do so, we may decline to entertain those issues. See State v. Lepsch, 2017 WI 27, ¶42, 374 Wis. 2d 98, 892 N.W.2d 682 ("We dismiss Lepsch's argument . . . as undeveloped."). Because the

11

Legislative Defendants failed to set forth sufficient arguments on several challenged provisions, these claims may proceed in the ordinary course of litigation on remand. We express no opinion on the merits of those claims.[9]

¶25 This opinion therefore addresses only the provisions properly raised in the complaint and substantively argued in the circuit court and before us. Accordingly, we will address all claims enjoined by the circuit court along with several additional provisions not enjoined but nonetheless argued by the parties.

## B. Standard of Review

¶26 A motion to dismiss tests the legal sufficiency of the complaint. Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693. For purposes of our review, we treat all allegations in the complaint as true. Id., ¶18. "However, legal conclusions asserted in a complaint are not accepted, and legal conclusions are insufficient to withstand a motion to dismiss." Id. Thus, our focus is on the factual allegations, not on any additional claims or arguments asserted by the parties. We then determine whether the facts

---

[9] Provisions raised in the complaint that we do not address are 2017 Wis. Act 369, § 87 (Wis. Stat. § 238.399(3)(am)); 2017 Wis. Act 370, § 10 (Wis. Stat. § 20.940), and § 11 (Wis. Stat. § 49.175(2)(a)). In the course of briefing, the parties reference many additional and often related provisions. We similarly decline to opine on any additional provisions not explicitly addressed in either this or Justice Kelly's opinion for the court.

alleged in the complaint state a viable cause of action. This is a legal question we review de novo, and one requiring no further factual development. Id., ¶17.

¶27 Granting injunctive relief is a discretionary decision that we review for an erroneous exercise of discretion. Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 519, 259 N.W.2d 310 (1977). Here, we conclude the circuit court should have granted the motion to dismiss with respect to the enjoined provisions discussed in this opinion and direct it to do so. By necessity, the temporary injunction based on these to-be-dismissed claims must be vacated as well.

¶28 This case raises questions requiring interpretation of constitutional and statutory provisions. These are questions of law we review de novo. League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶13, 387 Wis. 2d 511, 929 N.W.2d 209. It is the text of statutes that reflects the policy choices of the legislature, and therefore "statutory interpretation focus[es] primarily on the language of the statute." State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. The text of the constitution reflects the policy choices of the people, and therefore constitutional interpretation similarly focuses primarily on the language of the constitution. See League of Women Voters, 387 Wis. 2d 511, ¶¶16-18. "It is the enacted law, not the unenacted

13

intent, that is binding on the public."[10]  State ex rel. Kalal, 271 Wis. 2d 633, ¶44.

¶29 Our analysis begins in Part C with an overview of the separation of powers under the Wisconsin Constitution. In Part D, we address the standards governing facial and as-applied challenges. Finally, in Part E, we apply these principles claim by claim.

C. Separation of Powers Under the Wisconsin Constitution

¶30 "If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary." The Federalist No. 51, at 319 (James Madison) (Clinton Rossiter ed. 1961). James Madison's sober assessment of human nature and government power was rooted in the reality that fear of tyranny was not far from the men who risked their lives in the service of liberty. It

---

[10] For this reason, in statutory interpretation, we generally do not resort to extrinsic aids like legislative history unless the statute is ambiguous. State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶51, 271 Wis. 2d 633, 681 N.W.2d 110.

Resort to these extrinsic aids is likewise unnecessary where the constitutional text is plain. See League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶18, 387 Wis. 2d 511, 929 N.W.2d 209 (determining a historical review was unnecessary because the meaning of the constitutional text was clear). But where necessary, helpful extrinsic aids may include the practices at the time the constitution was adopted, debates over adoption of a given provision, and early legislative interpretation as evidenced by the first laws passed following the adoption. See State v. City of Oak Creek, 2000 WI 9, ¶18, 232 Wis. 2d 612, 605 N.W.2d 526.

was these men who drafted our country's Constitution and established a system where power is diffused to different branches. We are more than two centuries into the American constitutional experiment, but the separation of powers is not an anachronism from a bygone era. Our founders believed the separation of powers was not just important, but the central bulwark of our liberty. See Morrison v. Olson, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting) ("The Framers of the Federal Constitution . . . viewed the principle of separation of powers as the absolutely central guarantee of a just Government.").

¶31 The Wisconsin Constitution, adopted in 1848, was born of these same beliefs. Government power is divided into three separate branches, each "vested" with a specific core government power. Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384. By "vesting" the respective powers, our constitution "clothe[s]" that branch with the corresponding power; each branch is "put in possession of" a specific governmental power. Noah Webster, An American Dictionary of the English Language (1828). "The legislative power shall be vested in a senate and assembly"; "The executive power shall be vested in a governor"; and "The judicial power of this state shall be vested in a unified court system." Wis. Const. art. IV, § 1; id. art. V, § 1; id. art. VII, § 2. To exercise this vested power, the legislature is tasked with the enactment of laws; the governor is instructed to "take care that the laws be faithfully executed"; and courts are empowered to

15

adjudicate civil and criminal disputes pursuant to the law. Id. art. IV, § 17; id. art. V, § 4; id. art. VII, §§ 3, 5, 8, 14.

¶32 While the separation of powers is easy to understand in theory, it carries with it not-insignificant complications. Notably, the Wisconsin Constitution itself sometimes takes portions of one kind of power and gives it to another branch. For example, the governor is granted the power "to convene the legislature on extraordinary occasions" and is required to "communicate to the legislature, at every session, the condition of the state, and recommend such matters to them for their consideration as he may deem expedient." Id. art. V, § 4. And while the legislature generally makes the law, the supreme court has authority over the practice of law, which requires us to establish normative rules and guidelines that, although not legislation as such, have the same prescriptive effect. Id. art. VII, § 3(1); see also Wis. Stat. § 751.12 (detailing the supreme court's authority to "regulate pleading, practice, and procedure in judicial proceedings in all courts"); Rao v. WMA Sec., Inc., 2008 WI 73, ¶35, 310 Wis. 2d 623, 752 N.W.2d 220 ("A rule adopted by this court in accordance with Wis. Stat. § 751.12 is numbered as a statute, is printed in the Wisconsin Statutes, may be amended by both the court and the legislature, has been described by this court as 'a statute promulgated under this court's rule-making authority,' and has the force of law." (footnotes omitted)).

¶33 That said, these are exceptions to the default rule that legislative power is to be exercised by the legislative

16

branch, executive power is to be exercised by the executive branch, and judicial power is to be exercised by the judicial branch. "The Wisconsin constitution creates three separate co-ordinate branches of government, no branch subordinate to the other, no branch to arrogate to itself control over the other except as is provided by the constitution, and no branch to exercise the power committed by the constitution to another." State v. Holmes, 106 Wis. 2d 31, 42, 315 N.W.2d 703 (1982).

¶34 Nevertheless, determining "where the functions of one branch end and those of another begin" is not always easy. Id. at 42-43. Thus, we have described two categories of powers within each branch——exclusive or core powers, and shared powers. See Gabler, 376 Wis. 2d 147, ¶30.

¶35 A separation-of-powers analysis ordinarily begins by determining if the power in question is core or shared. Core powers are understood to be the powers conferred to a single branch by the constitution. State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999). If a power is core, "no other branch may take it up and use it as its own." Tetra Tech, 382 Wis. 2d 496, ¶48 (Kelly, J.). Shared powers are those that "lie at the intersections of these exclusive core constitutional powers." Horn, 226 Wis. 2d at 643. "The branches may exercise power within these borderlands but no branch may unduly burden or substantially interfere with another branch." Id. at 644 (citing State ex rel. Friedrich v. Circuit Court for Dane Cty., 192 Wis. 2d 1, 14, 531 N.W.2d 32 (1995) (per curiam)).

17

¶36 This legal framework is our starting point, but it must be filtered through the type of challenge before us. The Plaintiffs brought what is known as a facial challenge to all the statutory provisions in dispute. This is key to our disposition of the issues before us, and worthy of some extended examination.

### D. Facial and As-Applied Challenges

¶37 Challenges to the constitutionality of a statute are generally defined in two manners: as-applied and facial. League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶13, 357 Wis. 2d 360, 851 N.W.2d 302. As-applied challenges address a specific application of the statute against the challenging party. Id. With that focus, the reviewing court considers the facts of the particular case in front of it to determine whether the challenging party has shown that the constitution was actually violated by the way the law was applied in that situation. Id.

¶38 In a facial challenge, however, the challenging party claims that the law is unconstitutional on its face——that is, it operates unconstitutionally in all applications. Id. We have repeatedly reaffirmed that to successfully challenge a law on its face, the challenging party must show that the statute cannot be enforced "under any circumstances." Id.; see also State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63 ("If a challenger succeeds in a facial attack on a law, the law

18

is void 'from its beginning to the end.'" (quoted source omitted)).[11]

¶39 This is no small wall to scale. Proving a legislative enactment cannot ever be enforced constitutionally "is the most difficult of constitutional challenges" and an "uphill endeavor." League of Women Voters, 357 Wis. 2d 360, ¶15; State v. Dennis H., 2002 WI 104, ¶5, 255 Wis. 2d 359, 647 N.W.2d 851.

¶40 The United States Supreme Court has described facial challenges as "disfavored," and the type of constitutional attack that raises the risk of judicial overreach.[12] Wash. State

---

[11] See also Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶29, 376 Wis. 2d 147, 897 N.W.2d 384 (explaining "the standard for a facial challenge" is that the law "'cannot be constitutionally enforced' . . . 'under any circumstances'" (quoted source omitted)); Soc'y Ins. v. LIRC, 2010 WI 68, ¶26, 326 Wis. 2d 444, 786 N.W.2d 385 ("[A] facial constitutional challenge attacks the law itself as drafted by the legislature, claiming the law is void from its beginning to the end and that it cannot be constitutionally enforced under any circumstances . . . ."); State v. Cole, 2003 WI 112, ¶30, 264 Wis. 2d 520, 665 N.W.2d 328 ("A 'facial' challenge to the constitutionality of a statute means that the 'challenger must establish, beyond a reasonable doubt, that there are no possible applications or interpretations of the statute which would be constitutional.'" (quoted source omitted)).

[12] This court has previously acknowledged that requiring facial challenges to show a law cannot be enforced "under any circumstances" mirrors the standard enunciated by the United States Supreme Court in United States v. Salerno, 481 U.S. 739 (1987). League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶15, 357 Wis. 2d 360, 851 N.W.2d 302; see also id., ¶60 n.1 (Crooks, J., concurring) (citing Salerno as the applicable framework of law for facial challenges). In Salerno, the Court explained that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. at 745.

19

<u>Grange v. Wash. State Republican Party</u>, 552 U.S. 442, 450 (2008).  This is so in part because claims of facial invalidity often rest on speculation about what might occur in the future. <u>Id.</u>  They raise the serious risk of calling on courts to interpret statutes prematurely and decide legal questions before they must be decided.  <u>Id.</u> at 450-51.  Striking down a law facially "threaten[s] to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." <u>Id.</u> at 451.  Thus, caution in the face of a facial challenge shows due respect to the other branches of government——allowing the legislature to legislate and the executive to execute——which gives them space to carry out their own constitutional duties.

¶41 And beyond respect for other branches, facial challenges raise the risk of the judiciary overstepping its own constitutional authority.  The United States Supreme Court has explained the solemnity of exercising the judicial power:

> This Court, as is the case with all federal courts, "has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies.  In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered:  one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other

20

persons or other situations in which its application
might be unconstitutional.

United States v. Raines, 362 U.S. 17, 21 (1960) (citation
omitted).

¶42 Judicial modesty, then, counsels that "courts should not nullify more of a . . . law than necessary." Wash. State Grange, 552 U.S. at 456 (citation omitted). It also ensures that courts stay in their lane by prohibiting only unconstitutional applications of laws. If a law can only be applied unconstitutionally, it is our duty to say so. But if it can be applied constitutionally, it would be an overstep on our part to strike down a legislative enactment with constitutional applications.[13]

¶43 It is with this understanding and appreciation of a modest judicial power that this court has continually required a party bringing a facial challenge to prove that the statute cannot be constitutionally enforced "under any circumstances." This has not been a principle selectively applied; it is not

---

[13] In her partial dissent, Justice Dallet suggests that subjecting broad statutes to piecemeal, as-applied litigation invites this court to engage in policymaking. Justice Dallet's concurrence/dissent, ¶¶178-179. Quite the contrary. Requiring a party to prove a law is unconstitutionally applied to the facts of a given case is precisely how as-applied challenges work. Our decision here invites no more policymaking than any other as-applied challenge that a court entertains. Justice Dallet's alternative proposal to sweep aside more of a law than is necessary to quickly settle a matter is not, by any definition, a more modest route.

optional.[14] Parties casting the widest possible net and seeking the broadest possible remedy must make the maximum possible showing.

¶44 At oral argument, the Attorney General asserted that this standard should not apply to the laws affecting him because the facial challenge doctrine is applied only in cases involving private litigants. The Attorney General described the doctrine as a matter of standing, and claimed that because every controversy arising from the legislative approval provisions would involve the same public parties, the traditionally recognized concerns with facial-challenge adjudication are not at issue here. Hence, the Attorney General contends these

---

[14] The United States Supreme Court has recognized the validity of facial challenges premised on general claims of statutory overbreadth; however, the circumstances in which such challenges may be raised are very limited and not applicable here. See Sabri v. United States, 541 U.S. 600, 609-10 (2004). This court has taken a similar approach. See State v. Konrath, 218 Wis. 2d 290, 305, 577 N.W.2d 601 (1998) ("With the exception of a challenge under the First Amendment to the United States Constitution, a party does not have standing to raise a facial challenge that a statute is overbroad.").

In the face of our precedent, Justice Dallet dispenses with well-established law and instead chooses to adopt and apply the overbreadth standard to two legislative approval provisions. As an initial matter, Justice Dallet raises this sua sponte; no party argued that we should adopt overbreadth in place of our standard facial challenge framework. Moreover, in a case with many separation-of-powers questions, Justice Dallet does not argue that this new standard should apply across the board. It is unclear why. One is left to surmise that Justice Dallet's approach is a tacit, if not explicit, admission that current law does not support her conclusion on these issues. We see no need to change our law to fit this case. We will stick with and apply the law as it exists.

22

provisions may be facially challenged because every application will implicate his office and interested parties in the legislature. No such argument was made in briefing. And when pressed for supporting authority at oral argument, the Attorney General cited only to our decision in Gabler, 376 Wis. 2d 147.

¶45 Gabler plainly does not stand for the propositions advanced by the Attorney General. In that case, the Crime Victims Rights Board issued a decision that Judge Gabler had violated a victim's constitutional right to speedy disposition of the proceedings. Id., ¶21. Judge Gabler challenged the constitutionality of certain provisions under Wis. Stat. ch. 950 as they applied to judges. Id., ¶29. We agreed with him that the provisions could never be constitutionally applied against judges. Id., ¶60. In so doing, we recognized that the label of a challenging party's claim "is not what matters"; rather it is the "claim and the relief that would follow" that dictate the relevant standard of constitutional review. Id., ¶¶28-29 (quoting Doe v. Reed, 561 U.S. 186, 194 (2010)). The statutory challenge in Gabler included characteristics of both a facial and an as-applied claim. Id., ¶29. Namely, Judge Gabler sought to invalidate the challenged provisions insofar as they could ever be applied against judges——that is, he brought a broad challenge to a specific category of applications. Id., ¶29. In a challenge of this kind, we explained that the challenging party is still required to demonstrate that, as to the specific category of applications, the statute could not be constitutionally enforced under any circumstances. Id. Judge

23

Gabler had to show that the provisions could never be constitutionally applied against judges, even if it could be constitutionally applied to others. The statutory provisions in Gabler were neither challenged nor struck down in their entirety. In no way did our decision change the basic difference between a facial and an as-applied challenge.

¶46 In contrast, under the Attorney General's theory, so long as the relief requested does not reach beyond the parties before the court, a facial challenge can be subject to a more lenient standard of constitutional review. The Attorney General's approach would allow a court to order far broader relief than necessary to alleviate any unconstitutional applications of the law simply because litigation involves the same two public parties.

¶47 The Attorney General has acknowledged the existence of constitutional applications of the challenged provisions (more on this below), yet still asks that we strike down the laws in their entirety. As we have explained, this is contrary to an appropriate exercise of judicial power. The facial versus as-applied distinction is not merely a question of standing or whether the parties are public or private litigants. It goes to the appropriate reach of the judicial power to say what the law

is, and to craft a remedy appropriately tailored to any constitutional violation.[15]

¶48 In short, our law is clear and of long standing. A facial challenge requires a showing that all applications of the law are unconstitutional. It is the burden of the party bringing the challenge to prove this. And to the extent a party challenges the application of a law, it is the burden of that party to show that the specific application or category of applications is unconstitutional.

¶49 Before us, no arguments have been developed by any party setting forth challenges to specific applications or categories of applications. The parties arguing against the constitutionality of the provisions ask that we prohibit enforcement of the laws in their entirety. Therefore, we analyze each of the challenged provisions as facial challenges.

E. Application to Challenged Provisions

1. Legislative Involvement in Litigation

¶50 Several challenged provisions give the legislature or its committees power to participate in litigation involving the State. As a general rule, prior to 2017 Wis. Act 369, Wisconsin

---

[15] Furthermore, the default rule in Wisconsin is that statutes are severable. See Wis. Stat. § 990.001(11) ("If any provision of the statutes or of a session law is invalid, or the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.").

law authorized the attorney general to represent the State in litigation and to settle cases in the State's best interest. Provisions of 2017 Wis. Act 369 substantially changed that. See § 5 (Wis. Stat. § 13.365); § 26 (Wis. Stat. § 165.08(1)); § 30 (Wis. Stat. § 165.25(6)(a)1.); and § 97 (Wis. Stat. § 803.09(2m)).

¶51 Previously, the legislature had limited power to intervene in litigation. Now, Wis. Stat. § 13.365 and Wis. Stat. § 803.09(2m) give three state legislative committees, each acting on behalf of a particular legislative entity——the assembly, the senate, and the whole legislature, respectively—— the power to intervene in an action in state or federal court when a party argues a state statute is unconstitutional or "preempted by federal law," "or otherwise challenges [the statute's] construction or validity."[16]

---

[16] Wisconsin Stat. § 13.365 provides:

Pursuant to [Wis. Stat. §] 803.09(2m), when a party to an action challenges in state or federal court the constitutionality of a statute, facially or as applied, challenges a statute as violating or preempted by federal law, or otherwise challenges the construction or validity of a statute, as part of a claim or affirmative defense:

(1) The committee on assembly organization may intervene at any time in the action on behalf of the assembly. The committee on assembly organization may obtain legal counsel other than from the department of justice, with the cost of representation paid from the appropriation under [Wis. Stat. §] 20.765(1)(a), to represent the assembly in any action in which the assembly intervenes.

26

¶52 In addition, prior to Act 369, the attorney general had the power in many cases to settle litigation impacting the State as he thought in the best interest of the State. In Wis. Stat. § 165.08(1) and Wis. Stat. § 165.25(6)(a)1., much of that unilateral power has been removed and is now subject to legislative approval.

---

(2) The committee on senate organization may intervene at any time in the action on behalf of the senate. The committee on senate organization may obtain legal counsel other than from the department of justice, with the cost of representation paid from the appropriation under [Wis. Stat. §] 20.765(1)(b), to represent the senate in any action in which the senate intervenes.

(3) The joint committee on legislative organization may intervene at any time in the action on behalf of the legislature. The joint committee on legislative organization may obtain legal counsel other than from the department of justice, with the cost of representation paid from the appropriation under [Wis. Stat. §] 20.765(1)(a) or (b), as determined by the cochairpersons, to represent the legislature in any action in which the joint committee on legislative organization intervenes.

While Wis. Stat. § 803.09(2m) states:

When a party to an action challenges in state or federal court the constitutionality of a statute, facially or as applied, challenges a statute as violating or preempted by federal law, or otherwise challenges the construction or validity of a statute, as part of a claim or affirmative defense, the assembly, the senate, and the legislature may intervene as set forth under [Wis. Stat. §] 13.365 at any time in the action as a matter of right by serving a motion upon the parties as provided in [Wis. Stat. §] 801.14.

27

¶53 Wisconsin Stat. § 165.08(1) provides that the Department of Justice (DOJ), the agency headed by the attorney general, cannot settle or discontinue a case prosecuted by the attorney general unless either the legislative intervenor approves, or if the legislature has not intervened, DOJ receives approval from the Joint Committee on Finance (JFC). Further, if DOJ wishes to concede the validity of a statute, "it must first get permission from the joint committee on legislative organization before asking the joint committee on finance." § 165.08(1).[17]

¶54 Wisconsin Stat. § 165.25(6)(a)1. amends the power of the attorney general to settle actions seeking injunctive relief or involving a proposed consent decree. In such cases, the attorney general must obtain the approval of any legislative

---

[17] Wisconsin Stat. § 165.08(1) states:

Any civil action prosecuted by the department by direction of any officer, department, board, or commission, or any civil action prosecuted by the department on the initiative of the attorney general, or at the request of any individual may be compromised or discontinued with the approval of an intervenor under [Wis. Stat. §] 803.09(2m) or, if there is no intervenor, by submission of a proposed plan to the joint committee on finance for the approval of the committee. The compromise or discontinuance may occur only if the joint committee on finance approves the proposed plan. No proposed plan may be submitted to the joint committee on finance if the plan concedes the unconstitutionality or other invalidity of a statute, facially or as applied, or concedes that a statute violates or is preempted by federal law, without the approval of the joint committee on legislative organization.

28

intervenor. If no legislative entity has intervened, the new law establishes a multi-phase approval process with JFC. DOJ must first submit a plan to JFC. The JFC co-chairs, in turn, have 14 working days to notify the attorney general that the committee will meet to review the plan. If the attorney general receives notification from the committee of a meeting, the attorney general is required to obtain permission from JFC in order to settle. Moreover, the attorney general cannot submit a plan that concedes "the unconstitutionality or other invalidity of a statute, facially or as applied, or concedes that a statute violates or is preempted by federal law," without first getting approval from the Joint Committee on Legislative Organization. § 165.25(6)(a)1.[18]

---

[18] Wisconsin Stat. § 165.25(6)(a)1. now provides:

> At the request of the head of any department of state government, the attorney general may appear for and defend any state department, or any state officer, employee, or agent of the department in any civil action or other matter brought before a court or an administrative agency which is brought against the state department, or officer, employee, or agent for or on account of any act growing out of or committed in the lawful course of an officer's, employee's, or agent's duties. Witness fees or other expenses determined by the attorney general to be reasonable and necessary to the defense in the action or proceeding shall be paid as provided for in [Wis. Stat. §] 885.07. The attorney general may compromise and settle the action as the attorney general determines to be in the best interest of the state except that, if the action is for injunctive relief or there is a proposed consent decree, the attorney general may not compromise or settle the action without the approval of an intervenor under [Wis. Stat. §] 803.09(2m) or, if there is no intervenor,

¶55 The Plaintiffs argue (and the Governor and Attorney General agree) that this takes a core executive power and gives it to the legislature in violation of the separation of powers.[19] Specifically, they maintain that such a requirement impermissibly limits the governor's duty to "take care that the laws be faithfully executed." Wis. Const. art. V, § 4. If deemed a shared power, the Plaintiffs and Attorney General argue that these provisions substantially burden the executive branch in violation of the separation of powers. The Legislative Defendants offer two main defenses, and we take each in turn.

¶56 First, the Legislative Defendants argue these provisions are constitutional because the attorney general has no inherent constitutional powers, and the powers that are statutorily granted are therefore entirely subject to

> without first submitting a proposed plan to the joint committee on finance. If, within 14 working days after the plan is submitted, the cochairpersons of the committee notify the attorney general that the committee has scheduled a meeting for the purpose of reviewing the proposed plan, the attorney general may compromise or settle the action only with the approval of the committee. The attorney general may not submit a proposed plan to the joint committee on finance under this subdivision in which the plan concedes the unconstitutionality or other invalidity of a statute, facially or as applied, or concedes that a statute violates or is preempted by federal law, without the approval of the joint committee on legislative organization.

[19] "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them." Koschkee v. Taylor, 2019 WI 76, ¶11, 387 Wis. 2d 552, 929 N.W.2d 600 (quoting Schuette v. Van De Hey, 205 Wis. 2d 475, 480-81, 556 N.W.2d 127 (Ct. App. 1996)).

30

legislative modification. With this, they argue that because the attorney general is not the governor (whom the Wisconsin Constitution specifically "vests" with the executive power), any modifications to the attorney general's power cannot implicate the separation of powers.

¶57 We disagree. Our constitution describes only three types of power——legislative, executive, and judicial. When pressed to say at oral argument what exactly the attorney general is doing if not executing the law, the Legislative Defendants had no good answer. There is none. The attorney general is assuredly a member of the executive branch whose duties consist in executing the law.

¶58 The constitution itself plainly acknowledges officers other than the governor who may permissibly deploy executive power. Article IV, Section 28 requires "Members of the legislature, and all officers, executive and judicial, except such inferior officers as may be by law exempted," to take an oath before entering upon the duties of their office. Wis. Const. art. IV, § 28 (emphasis added). The only fair reading of this is that there are other executive officers besides the governor.

¶59 Article VI of the constitution covers administrative officers. This article establishes three statewide officers—— the secretary of state, the treasurer, and the attorney general. Id. art. VI, §§ 2, 3. It also establishes various county officers, including coroners, registers of deeds, district attorneys, sheriffs, and chief executive officers. Id. art. VI,

31

§ 4. But these administrative officers do not constitute a separate "administrative" branch of government carrying out something called "administrative" power. We have repeatedly recognized that the constitution describes only three types of government power and creates only three branches of government. Panzer v. Doyle, 2004 WI 52, ¶48, 271 Wis. 2d 295, 680 N.W.2d 666 ("Our state constitution has created three branches of government, each with distinct functions and powers."), overruled on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408; Gabler, 376 Wis. 2d 147, ¶11 (same); State v. Washington, 83 Wis. 2d 808, 816, 825, 266 N.W.2d 597 (1978) (same).

¶60 While the constitution vests executive power in the governor and also places primary responsibility on the governor to see that the laws are faithfully executed (Wis. Const. art. V, §§ 1, 4), our cases have made clear that these "administrative" officers carry out executive functions. In 1855, just a few short years after adoption of the Wisconsin Constitution, Justice Abram Smith observed "that sheriffs, coroners, registers of deeds, and district attorneys . . . are a part of the executive department." Attorney Gen. ex rel. Bashford v. Barstow, 4 Wis. 567, 795 (1855). Just last term we held that the superintendent of public instruction "has the executive constitutional function to supervise public instruction." Koschkee v. Taylor, 2019 WI 76, ¶¶2, 25-29, 387 Wis. 2d 552, 929 N.W.2d 600. We have also said that state administrative agencies "are considered part of the executive

32

branch." Id., ¶14. DOJ, through which the attorney general carries out his functions, is such an administrative agency and therefore part of the executive branch. See Wis. Stat. § 15.01(5) and Wis. Stat. § 15.25 (creating the "executive branch" agency, the department of justice, "under the direction and supervision of the attorney general"). And we have explicitly made this point with reference to the attorney general himself, calling him "a high constitutional executive officer." State v. Woodington, 31 Wis. 2d 151, 167, 142 N.W.2d 810 (1966); see also Milo M. Quaife, The Struggle Over Ratification 1846-47, at 456 ("The subordinate executive, or as they are called, administrative officers, are a secretary of state who is ex officio auditor, a treasurer, and an attorney general . . . .").

¶61 The Legislative Defendants also hang their hat on Oak Creek where we held that the attorney general has no constitutionally granted powers. State v. City of Oak Creek, 2000 WI 9, ¶¶24, 55, 232 Wis. 2d 612, 605 N.W.2d 526. The powers the attorney general does have, we explained, "are prescribed only by statutory law," and the attorney general "has no common-law powers or duties." Id., ¶¶21, 24 (quoted source omitted); see also State v. Snyder, 172 Wis. 415, 417, 179 N.W. 579 (1920) ("In this state the attorney general has no common-law powers or duties.").

¶62 This principle is true, but inapplicable to the case at hand. The question in this case is not whether the legislature may give or take powers away from the attorney

33

general; it may. The question is whether the legislature may participate in carrying out the executive branch functions previously assigned to the attorney general. Or said another way, the question is not whether the legislature may circumscribe the attorney general's executive powers, but whether it may assume them, at least in part, for itself. Thus, Oak Creek is inapposite to the separation-of-powers argument at the heart of this case.

¶63 The Legislative Defendants offer a second argument, this one with more traction. They argue that the attorney general's power to litigate on behalf of the State is not, at least in all circumstances, within the exclusive zone of executive authority. We agree. While representing the State in litigation is predominately an executive function, it is within those borderlands of shared powers, most notably in cases that implicate an institutional interest of the legislature.

¶64 One kind of institutional interest is reflected in the statutory language authorizing the attorney general to represent the State or state officials at the request of the legislature. Wis. Stat. § 165.25(1m). Early enactments following the adoption of the constitution are appropriately given special weight. Oak Creek, 232 Wis. 2d 612, ¶18. This is because these enactments are likely to reflect the original public meaning of the constitutional text. See id., ¶¶29-31; Koschkee, 387 Wis. 2d 552, ¶32. In that vein, the attorney general was granted the power, even the duty, to represent the legislature

34

or to represent the State at the request of the legislature from our state's earliest days.

¶65  When the Wisconsin Constitution created the office of attorney general, it specified that his duties "shall be prescribed by law."  Oak Creek, 232 Wis. 2d 612, ¶15 (quoting Wis. Const. art. IV, § 3 (1846) (proposed)); Wis. Const. art. VI, § 3.  So the first legislature of our new state went about prescribing those duties by statute.  In 1848, the same year the constitution was adopted, the legislature enacted a law requiring the attorney general to "appear for the state in any court or tribunal in any other causes criminal or civil in which the state may be a party or be interested," and this was to occur "when required by the governor or either branch of the legislature."  An Act concerning the Attorney General, Wis. Laws 1848 (emphasis added).  This language was modified in 1849: "[W]hen requested by the governor or either branch of the legislature," the attorney general was required to "appear for the people of this state, and prosecute or defend in any other court, or before any officer, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested."  Wis. Stat. ch. 9, § 36 (1849) (emphasis added).

¶66 This language remains substantially the same today. See Wis. Stat. § 165.25(1m).[20]  Therefore, under the law since

---

[20] Wisconsin Stat. § 165.25(1m) provides:

The department of justice shall:

. . . .

35

our state's founding, the attorney general may defend a legislative official, employee, or body. And either house of the legislature can request the attorney general to "prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." Id.

¶67 These early prescriptions, adopted nearly contemporaneously with the adoption of our state constitution, reflect an understanding that the attorney general's role is not, at least in all cases, a core executive function. The legislature's institutional interest as a represented party, and as one that can authorize the attorney general to prosecute cases, puts at least some of these cases within the zone of shared powers.

---

(1m) REPRESENT STATE IN OTHER MATTERS. If requested by the governor or either house of the legislature, appear for and represent the state, any state department, agency, official, employee or agent, whether required to appear as a party or witness in any civil or criminal matter, and prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested. The joint committee on legislative organization may intervene as permitted under [Wis. Stat. §] 803.09(2m) at any time. The public service commission may request under [Wis. Stat. §] 196.497(7) that the attorney general intervene in federal proceedings. All expenses of the proceedings shall be paid from the appropriation under [Wis. Stat. §] 20.455(1)(d).

(Emphasis added.)

36

¶68 Another on-point institutional interest of the legislature is spelled out in the constitution. Article VIII, Section 2 states in relevant part, "No money shall be paid out of the treasury except in pursuance of an appropriation by law." Wis. Const. art. VIII, § 2. The legislature, of course, is the branch granted the power to enact laws. Id. art. IV, § 17.

¶69 The takeaway is that the constitution gives the legislature the general power to spend the state's money by enacting laws. Therefore, where litigation involves requests for the state to pay money to another party, the legislature, in at least some cases, has an institutional interest in the expenditure of state funds sufficient to justify the authority to approve certain settlements. The Attorney General himself conceded during oral argument that Wis. Stat. § 165.25(6)(a)1. has constitutional applications where the power of the purse is implicated.

¶70 Other state legislatures appear to have this power as well under various circumstances. See Ariz. Rev. Stat. Ann. § 41-621(N) (2019) (requiring approval of some settlements by joint legislative budget committee after reaching certain dollar threshold); Conn. Gen. Stat. Ann. § 3-125a(a) (2019) (requiring approval of settlements exceeding certain dollar threshold by the legislature); Neb. Rev. Stat. § 81-8,239.05(4) (2018) (requiring legislative approval in order to pay punitive damages); Okla. Stat. Ann. tit. 51 § 200(A)(1) (2019) (requiring legislative approval for settlement or consent decrees above certain dollar threshold); Utah Code Ann. § 63G-10-202 (2018)

37

(same). Although the practice of other states is not determinative of the constitutional questions before us, this generally reflects a shared understanding that legitimate institutional, even constitutional, legislative interests may be implicated when the attorney general purports to enter settlement agreements affecting state appropriations.

¶71 These institutional interests of the legislature are sufficient to defeat the facial challenge to the provisions authorizing legislative intervention in certain cases, and those requiring legislative consent to defend and prosecute certain cases. Namely, where a legislative official, employee, or body is represented by the attorney general, the legislature has, in at least some cases, an institutional interest in the outcome of that litigation. Similarly, where a legislative body is the principal authorizing the attorney general's representation in the first place, the legislature has an institutional interest in the outcome of that litigation in at least some cases. This is true where the attorney general's representation is in defense of the legislative official, employee, or body, or where a legislative body is the principal authorizing the prosecution of a case. And in cases where spending state money is at issue, the legislature has a constitutional institutional interest in at least some cases sufficient to allow it to require legislative agreement with certain litigation outcomes, or even to allow it to intervene.

¶72 Because this is a facial challenge, and there are constitutional applications of these laws, that challenge cannot

38

succeed. In at least some cases, the legislature may permissibly give itself the power to consent to an agreement where the action involves injunctive relief or a proposed consent decree (Wis. Stat. § 165.25(6)(a)1.), or in the compromise or discontinuance of a matter being prosecuted (Wis. Stat. § 165.08). In at least some cases, we see no constitutional violation in allowing the legislature to intervene in litigation concerning the validity of a statute, at least where its institutional interests are implicated.[21] See Wis. Stat. § 13.365; Wis. Stat. § 803.09(2m). As we have explained, because the Plaintiffs have not met their burden to prove these provisions may not be constitutionally applied under any circumstances, the motion to dismiss the Plaintiffs' facial challenge should have been granted.[22]

---

[21] The legislature, or its committees or members, have litigated cases in Wisconsin impacting potential institutional interests throughout the history of the state. See Risser v. Klauser, 207 Wis. 2d 176, 180, 558 N.W.2d 108 (1997) (original action brought by several legislators against the governor); Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 487-88, 534 N.W.2d 608 (1995) (original action brought by citizens utility board and several legislators against the governor and the secretary of the Department of Administration); State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 433, 424 N.W.2d 385 (1988) (original action brought by, among other petitioners, the senate and assembly against the governor).

[22] As explained above, the attorney general's litigation authority is not, in at least some cases, an exclusive executive power. These types of cases fall under a shared powers analysis. Where the legislature has appropriate institutional interests, legislative exercise of this shared power in at least some cases does not unduly burden or substantially interfere with the attorney general's executive authority. Hence, the facial challenge gets nowhere under an "unduly burdensome" shared powers analysis.

39

¶73 We stress that this decision is limited. We express no opinion on whether individual applications or categories of applications may violate the separation of powers, or whether the legislature may have other valid institutional interests supporting application of these laws. But the facial challenge seeking to strike down Wis. Stat. § 13.365; Wis. Stat. § 165.08(1); Wis. Stat. § 165.25(6)(a)1.; and Wis. Stat. § 803.09(2m) in their entirety——the only claim developed before us——does not succeed. Given this, the order enjoining these provisions is vacated as well.

## 2. Capitol Security

¶74 The Plaintiffs also challenge the constitutionality of 2017 Wis. Act 369, § 16 (Wis. Stat. § 16.84(2m)), which grants the Joint Committee of Legislative Organization (JCLO) the authority to review and approve changes proposed by the Department of Administration (DOA) to security at the Capitol.[23]

---

[23] This provision, Wis. Stat. § 16.84(2m), which was not enjoined by the circuit court, states as follows:

Send notice to the joint committee on legislative organization of any proposed changes to security at the capitol, including the posting of a firearm restriction under [Wis. Stat. §] 943.13 (1m)(c)2. or 4. If, within 14 working days after the date of the notice, the cochairpersons of the joint committee on legislative organization do not notify the department that the committee has scheduled a meeting to review the department's proposal, the department may implement the changes as proposed in the notice. If, within 14 working days after the date of the department's notice, the cochairpersons of the committee notify the department that the committee has

40

This new provision requires DOA to notify JCLO of any proposed security changes. § 16.84(2m). If JCLO does not notify DOA within 14 days that a meeting has been scheduled to discuss the proposed changes, DOA may implement those changes. Id. However, if JCLO schedules a meeting to discuss the proposal, DOA may proceed with the proposed changes only with the approval of JCLO. Id. The statute also provides an exception if there is risk of imminent danger. Id.

¶75 The Legislative Defendants contend this section is squarely permissible within the framework of J.F. Ahern Co. v. Wisconsin State Building Commission, 114 Wis. 2d 69, 336 N.W.2d 679 (Ct. App. 1983), and Martinez, 165 Wis. 2d 687. Specifically, the Legislative Defendants maintain this is "a cooperative venture" with the "proper standards or safeguards" to avoid a separation-of-powers violation. Ahern, 114 Wis. 2d at 108; Martinez, 165 Wis. 2d at 701 (quoted source omitted). The Plaintiffs characterize this section as an impermissible legislative veto that violates bicameralism and presentment as well as the constitution's quorum requirement. See Wis. Const. art. IV, § 7; id. art. V, § 10.

---

scheduled a meeting to review the department's proposal, the department may implement the proposed changes only upon approval of the committee. If there is a risk of imminent danger, the department may take any action related to security at the capitol that is necessary to prevent or mitigate the danger and the cochairpersons may review the action later if the cochairpersons determine review is necessary.

41

¶76 <u>Ahern</u> correctly noted that the construction and maintenance of public buildings is an executive function. 114 Wis. 2d at 106. In fact, the legislature created DOA and granted it broad duties to construct and repair state buildings, among other tasks. Wis. Stat. § 15.10; Wis. Stat. § 16.85. <u>See generally</u> Wis. Stat. ch. 16. However, before the enactment of Wis. Stat. § 16.84(2m), the legislature, by statute, created and implemented limitations on DOA's authority. For example, Wis. Stat. § 16.843 denotes where and how vehicles may park around the Capitol. Likewise, even before § 16.84(2m) was enacted, DOA's authority to use state buildings for public events did not include the areas of the Capitol reserved for use by the legislature. <u>See</u> Wis. Admin. Code § DOA 2.04(1) (July 2014).

¶77 We conclude that control of at least legislative space in the Capitol is a shared power between the legislature and executive branches. It logically follows that if the legislature can control the use of legislative space, as it already does in many ways, it can also control the security measures put in place for use of that space. Because there are at the very least some constitutional applications of this provision, the facial challenge to Wis. Stat. § 16.84(2m) cannot succeed.

3. Multiple Suspensions of Administrative Rules

¶78 The Plaintiffs also challenge 2017 Act 369, § 64 (Wis. Stat. § 227.26(2)(im)), which allows the Joint Committee for

42

Review of Administrative Rules (JCRAR) to suspend a rule more than once.[24]

¶79 Wisconsin agencies are required to promulgate rules for "each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute." Wis. Stat. § 227.10(1). When promulgated as required by statute, rules have "the force of law." Wis. Stat. § 227.01(13). Current statutory law authorizes JCRAR to review rules prior to promulgation, and to suspend rules following promulgation. See Wis. Stat. § 227.19; Wis. Stat. § 227.26. The legislature can establish the procedures by which an agency promulgates rules, and can even take away rulemaking authority altogether. Koschkee, 387 Wis. 2d 552, ¶20. Additionally, the legislature may limit or retract its delegation of rulemaking authority, review rules prior to implementation, and determine the methods agencies must use to promulgate rules. Id.

¶80 In Martinez, this court addressed the constitutionality of this temporary rule suspension power. 165 Wis. 2d at 691. We upheld the ability of JCRAR to temporarily suspend a rule for three months, reasoning that "[i]t is appropriate for the legislature to delegate rule-making authority to an agency while retaining the right to review any

---

[24] This new paragraph states: "Notwithstanding pars. (i) and (j), the committee may act to suspend a rule as provided under this subsection multiple times." Wis. Stat. § 227.26(2)(im).

43

rules promulgated under the delegated power." Id. at 698. In so doing, we also stressed the importance of the temporary nature of the suspension. Id. at 699-700. To permanently repeal a suspended rule, the legislature must pass a bill in both houses and have it signed by the governor. Id. If no repeal occurs, the rule remains in effect and cannot be suspended again. Id. at 700. This structure, we concluded, did not violate the separation of powers. Id. at 700-01.

¶81 Under the new legislative changes, the legislature may impose the temporary three-month suspension addressed in Martinez multiple times. The parties do not ask us to revisit Martinez or any of its conclusions. Under Martinez, an endless suspension of rules could not stand; there exists at least some required end point after which bicameral passage and presentment to the governor must occur. Id. at 700. But also under Martinez, a single temporary three-month suspension is permissible.

¶82 Accepting these boundary markers, if one three-month suspension is constitutionally permissible, two three-month suspensions are as well. Under such a scenario, the six-month (rather than three-month) delay would still be followed by acceptance of the rule or repeal through bicameral passage and presentment. This fits comfortably within the unchallenged reasoning of Martinez——a modest suspension that is temporary in nature.

¶83 Again, this case comes to us as a facial challenge. To succeed, every application of this law must be found

44

unconstitutional. Because this provision has constitutional applications, the facial challenge must necessarily fail. To strike down all applications of this law, or to draw a line in the future under which an additional suspension is too long is exactly the sort of speculation that counsels caution and a narrow application of Martinez in the context of a facial challenge. The facial challenge to Wis. Stat. § 227.26(2)(im) must be dismissed on remand, and the order enjoining this provision is thereby vacated as well.

### 4. Agency Deference Provision

¶84 The Plaintiffs also challenge the constitutionality of 2017 Wis. Act 369, § 35 (Wis. Stat. § 227.10(2g)), which provides: "No agency may seek deference in any proceeding based on the agency's interpretation of any law." This provision partially codifies our holding in Tetra Tech where we ended "our practice of deferring to administrative agencies' conclusions of law." 382 Wis. 2d 496, ¶108. Given our own decision that courts should not defer to the legal conclusions of an agency, a statute instructing agencies not to ask for such deference is facially constitutional.

### III. CONCLUSION

¶85 This writing constitutes the majority opinion of the court on all issues raised in this case other than the guidance document provisions, which are addressed in Justice Kelly's

45

opinion for the court. With respect to the issues addressed in this opinion, we conclude as follows.

¶86 For all provisions where arguments were sufficiently developed, the Legislative Defendants have successfully shown that the motion to dismiss the facial challenge to these laws should have been granted. On remand, we direct the circuit court to grant the motion to dismiss with respect to these provisions.[25] We also vacate the temporary injunction in full for all provisions addressed in this opinion.[26] We stress that we pass no judgment on the constitutionality of individual applications or categories of applications of these laws. The judicial power is at once immense, yet modest. While it is our solemn obligation to say what the law is, that power extends to deciding only the cases and claims actually presented. And that is what we do today.[27]

---

[25] Specifically, we reverse the circuit court's order denying the motion to dismiss with respect to: 2017 Wis. Act 369, § 5 (Wis. Stat. § 13.365); § 16 (Wis. Stat. § 16.84(2m)); § 26 (Wis. Stat. § 165.08(1)); § 30 (Wis. Stat. § 165.25(6)(a)1.); § 35 (Wis. Stat. § 227.10(2g)); § 64 (Wis. Stat. § 227.26(2)(im)); and § 97 (Wis. Stat. § 803.09(2m)).

[26] The circuit court's temporary injunction is vacated with respect to the following provisions: 2017 Wis. Act 369, § 26 (Wis. Stat. § 165.08(1)); § 30 (Wis. Stat. § 165.25(6)(a)1.); § 64 (Wis. Stat. § 227.26(2)(im)).

[27] Following oral argument, the Attorney General moved to modify the stay of the temporary injunction that we imposed on June 11, 2019. As we remand this case for the circuit court to issue an order vacating its temporary injunction order in part, we deny the Attorney General's motion.

*By the Court.*—The judgment of the circuit court is affirmed in part and reversed in part, the temporary injunction is vacated in part, and the cause is remanded for further proceedings consistent with this opinion and the opinion of Justice Daniel Kelly.

¶87 DANIEL KELLY, J. The great Justice Joseph Story once said "the three great powers of government . . . should for ever be kept separate and distinct." 2 Joseph Story, <u>Commentaries on the Constitution of the United States</u> § 519, at 2-3 (Boston, Hilliard, Gray, & Co. 1833). We agree. As a consequence, we conclude that when the legislature prohibited the executive branch from communicating with the public through the issuance of guidance documents without first going through a pre-clearance process and including legislatively-mandated content, it invaded the executive branch's exclusive province to "take care that the laws be faithfully executed." Wis. Const. art. V, § 4.

¶88 This opinion is the opinion of the court with respect to 2017 Wis. Act 369, §§ 31, 33, 38, 65-71, and 104-105, all of which address (at least in part) the subject of guidance documents. Here, we explain why § 33 (to the extent it applies to guidance documents) and § 38 unconstitutionally intrude on power the constitution vested in the executive branch of government. We also describe why § 31 (which defines what a guidance document is), §§ 65-71 (to the extent they provide judicial review of guidance documents), and §§ 104-05 (which describe the applicability and effective date of § 33) are not facially unconstitutional.

1

I.  BACKGROUND[1]

¶89 "Guidance documents" are not conceptually new to administrative agencies, although they had no statutory definition until the Act created Wis. Stat. § 227.01(3m) (2017-18)[2] to read as follows:

(a) "Guidance document" means, except as provided in par. (b), any formal or official document or communication issued by an agency, including a manual, handbook, directive, or informational bulletin, that does any of the following:

1. Explains the agency's implementation of a statute or rule enforced or administered by the agency, including the current or proposed operating procedure of the agency.

2. Provides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency, if that guidance or advice is likely to apply to a class of persons similarly affected.

2017 Wis. Act. 369, § 31 (Wis. Stat. § 227.01(3m)).

¶90  The Act regulates guidance documents in several ways, the following two of which implicate the boundaries between the executive and legislative branches.  The first is § 33, which requires administrative agencies (with some exceptions) to identify existing law that supports a guidance document's contents:

---

[1] The part of the court's opinion authored by Justice Brian Hagedorn provides the broad background strokes necessary to consider SEIU's claims.  In this part of the court's opinion, we provide some additional context for our treatment of the "guidance document" provisions of 2017 Wis. Act 369.

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

Agency publications. An agency, other than the Board of Regents of the University of Wisconsin System, the Technical College System Board, or the department of employee trust funds, shall identify the applicable provision of federal law or the applicable state statutory or administrative code provision that supports any statement or interpretation of law that the agency makes in any publication, whether in print or on the agency's Internet site, including guidance documents, forms, pamphlets, or other informational materials, regarding the laws the agency administers.

2017 Wis. Act. 369, § 33 (Wis. Stat. § 227.05). The second is § 38, which describes the procedure an administrative agency must follow when creating a guidance document.

(1)(a) Before adopting a guidance document, an agency shall submit to the legislative reference bureau the proposed guidance document with a notice of a public comment period on the proposed guidance document under par. (b), in a format approved by the legislative reference bureau, for publication in the register. The notice shall specify the place where comments should be submitted and the deadline for submitting those comments.

(b) The agency shall provide for a period for public comment on a proposed guidance document submitted under par. (a), during which any person may submit written comments to the agency with respect to the proposed guidance document. Except as provided in par. (c), the period for public comment shall end no sooner than the 21st day after the date on which the proposed guidance document is published in the register under s. 35.93(2)(b)3.im. The agency may not adopt the proposed guidance document until the comment period has concluded and the agency has complied with par. (d).

(c) An agency may hold a public comment period shorter than 21 days with the approval of the governor.

(d) An agency shall retain all written comments submitted during the public comment period under par. (b) and shall consider those comments in determining whether to adopt the guidance document as originally proposed, modify the proposed guidance document, or take any other action.

3

(2) An agency shall post each guidance document that the agency has adopted on the agency's Internet site and shall permit continuing public comment on the guidance document. The agency shall ensure that each guidance document that the agency has adopted remains on the agency's Internet site as provided in this subsection until the guidance document is no longer in effect, is no longer valid, or is superseded or until the agency otherwise rescinds its adoption of the guidance document.

(3) A guidance document does not have the force of law and does not provide the authority for implementing or enforcing a standard, requirement, or threshold, including as a term or condition of any license. An agency that proposes to rely on a guidance document to the detriment of a person in any proceeding shall afford the person an adequate opportunity to contest the legality or wisdom of a position taken in the guidance document. An agency may not use a guidance document to foreclose consideration of any issue raised in the guidance document.

(4) If an agency proposes to act in any proceeding at variance with a position expressed in a guidance document, it shall provide a reasonable explanation for the variance. If an affected person in any proceeding may have relied reasonably on the agency's position, the explanation must include a reasonable justification for the agency's conclusion that the need for the variance outweighs the affected person's reliance interest.

(5) Persons that qualify under s. 227.12 to petition an agency to promulgate a rule may, as provided in s. 227.12, petition an agency to promulgate a rule in place of a guidance document.

(6) Any guidance document shall be signed by the secretary or head of the agency below the following certification: "I have reviewed this guidance document or proposed guidance document and I certify that it complies with sections 227.10 and 227.11 of the Wisconsin Statutes. I further certify that the guidance document or proposed guidance document contains no standard, requirement, or threshold that is not explicitly required or explicitly permitted by a statute or a rule that has been lawfully promulgated. I further certify that the guidance

4

document or proposed guidance document contains no standard, requirement, or threshold that is more restrictive than a standard, requirement, or threshold contained in the Wisconsin Statutes."

(7)(a) This section does not apply to guidance documents adopted before the first day of the 7th month beginning after the effective date of this paragraph . . . [LRB inserts date], but on that date any guidance document that has not been adopted in accordance with sub. (1) or that does not contain the certification required under sub. (6) shall be considered rescinded.

(b) This section does not apply to guidance documents or proposed guidance documents of the Board of Regents of the University of Wisconsin System, the Technical College System Board, or the department of employee trust funds.

(8) The legislative council staff shall provide agencies with assistance in determining whether documents and communications are guidance documents that are subject to the requirements under this section.

2017 Wis. Act. 369, § 38 (Wis. Stat. § 227.112).

¶91 SEIU alleges § 38 violates the separation of powers, and Governor Tony Evers alleges that, to the extent it addresses guidance documents, § 33 does the same. For the following reasons, we agree.

## II. STANDARD OF REVIEW

¶92 We are reviewing the circuit court's denial of the Legislative Defendants'[3] motion to dismiss the plaintiffs' complaint, as well as the temporary injunction the circuit court

---

[3] The "Legislative Defendants," who were sued in their official capacity, are Wisconsin Assembly Speaker Robin Vos, Wisconsin Senate President Roger Roth, Wisconsin Assembly Majority Leader Jim Steineke, and Wisconsin Senate Majority Leader Scott Fitzgerald.

5

granted with respect to §§ 31, 33, 38, 65-71, and 104-05. The motion to dismiss asserted that the plaintiffs' complaint failed to state a claim upon which relief could be granted. "Whether a complaint states a claim upon which relief can be granted is a question of law for our independent review[.]" Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶17, 356 Wis. 2d 665, 849 N.W.2d 693. The motion puts at issue whether the guidance document provisions of 2017 Wis. Act 369 are facially unconstitutional. A statute is facially unconstitutional only when it "cannot be enforced 'under any circumstances.'" Mayo v. Wisconsin Injured Patients & Families Comp. Fund, 2018 WI 78, ¶24, 383 Wis. 2d 1, 914 N.W.2d 678 (quoted source omitted).

¶93 A circuit court may issue a temporary injunction if: "(1) the movant is likely to suffer irreparable harm if a temporary injunction is not issued; (2) the movant has no other adequate remedy at law; (3) a temporary injunction is necessary to preserve the status quo; and (4) the movant has a reasonable probability of success on the merits." Milwaukee Deputy Sheriffs' Ass'n v. Milwaukee Cty., 2016 WI App 56, ¶20, 370 Wis. 2d 644, 883 N.W.2d 154 (citing Werner v. A.L. Grootemaat & Sons, Inc., 80 Wis. 2d 513, 520-21, 259 N.W.2d 310 (1977)). We review the circuit court's decision to issue a temporary injunction for an erroneous exercise of discretion. Id.

III. ANALYSIS

¶94 Our inquiry into the constitutionality of the Act's guidance document provisions requires that we determine whether

6

the creation of such a document represents the exercise of executive as opposed to legislative power. We then assess whether the Act's guidance document provisions impermissibly encroach on the executive branch's authority to promulgate those documents.

   A.   The Nature of Executive and Legislative Powers

   ¶95  It is common knowledge that the Wisconsin Constitution organizes our government in a tripartite structure. Goodland v. Zimmerman, 243 Wis. 459, 466-67, 10 N.W.2d 180 (1943) ("[G]overnmental powers are divided among the three departments of government, the legislative, the executive, and judicial[.]").    At the risk of oversimplification, the legislature's authority comprises the power to make the law,[4] whereas the executive's authority consists of executing the law.[5] The distinction between the two has been described as the difference between the power to prescribe and the power to put something into effect:

> In 1792, Jacques Necker, the famous French statesman, neatly summed up the function and significance of the executive power. Of the function: "[I]f by a fiction we were for a moment to personify the legislative and the executive powers, the latter in speaking of the former might . . . say: All that this man has talked of, I will perform." Of the significance: "The laws would in effect be nothing more than counsels, than so many maxims more or less sage, without this active and vigilant authority,

---

[4] "The legislative power shall be vested in a senate and assembly." Wis. Const. art. IV, § 1.

[5] "The executive power shall be vested in a governor." Wis. Const. art. V, § 1.

7

which assures their empire and transmits to the administration the motion of which it stands in need."

Saikrishna Prakash, The Essential Meaning of Executive Power, 2003 U. Ill. L. Rev. 701, 819 (2003) (quoted source omitted). This commentator concluded that, "[i]n the late-eighteenth century, someone vested with the executive power and christened as the chief executive enjoyed the power to control the execution of law." Id.

¶96 The executive, however, is not a legislatively-controlled automaton. Before executing, he must of necessity determine for himself what the law requires him to do. As Alexander Hamilton said, "[h]e who is to execute the laws must first judge for himself of their meaning." See Alexander Hamilton, Letters of Pacificus No. 1 (June 29, 1793), reprinted in 4 The Works of Alexander Hamilton 438 (Henry Cabot Lodge ed. 1904). This is intrinsic to the very nature of executive authority.

> The executive must certainly interpret and apply the law; it would be impossible to perform his duties if he did not. After all, he must determine for himself what the law requires (interpretation) so that he may carry it into effect (application). Our constitution not only does not forbid this, it requires it.

Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶53, 382 Wis. 2d 496, 914 N.W.2d 21 (Kelly, J., lead op.). See also Wis. Const. art. V, § 1 ("The executive power shall be vested in a governor . . . ."); Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 119 (2015) (Thomas, J., concurring) ("It is undoubtedly true that the other branches of Government have the authority and obligation to interpret the law . . . .").

8

¶97 The executive oftentimes carries out his functions through administrative agencies.[6] Although agencies have sometimes been criticized as a "headless fourth branch of government,"[7] they are not——we have only three. Agencies must belong to one of them, and we have said before that they are one manifestation of the executive. Koschkee v. Taylor, 2019 WI 76, ¶14, 387 Wis. 2d 552, 929 N.W.2d 600 ("Agencies are considered part of the executive branch.").[8] This understanding is not

---

[6] See, e.g., Util. Air Regulatory Grp. v. E.P.A., 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President, acting at times through agencies . . . 'faithfully execute[s]' them." (quoting U.S. Const. art. II, § 3 (alterations in original))); State ex rel. Wisconsin Dev. Auth. v. Dammann, 228 Wis. 147, 159, 277 N.W. 278 on reh'g, 228 Wis. 147, 280 N.W. 698 (1938) ("It is fundamental that under our constitutional system the governmental power to execute the laws is vested in the executive department of the state, and can be exercised only by duly constituted officers thereof."); DOR v. Nagle-Hart, Inc., 70 Wis. 2d 224, 226-27, 234 N.W.2d 350 (1975) ("It is for the department[s] to implement and carry out the mandate of the legislative enactments . . . and stop at the limits of such legislative mandate or direction."); Black & Decker, Inc. v. DILHR, No. 1988AP0409, unpublished slip op. (Sept. 15, 1988) (Wherein the court of appeals described the function of an agency as one of carrying out and implementing a legislative act.).

[7] Peter L. Strauss Agencies' Place in Government, 84 Colum. L. Rev. 573, 578 (1984) (internal marks and quoted source omitted).

[8] This is also apparent from the fact that the governor appoints agency secretaries, all of whom serve at the governor's pleasure. Wis. Stat. § 15.05(1)(a) ("If a department is under the direction and supervision of a secretary, the secretary shall be nominated by the governor, and with the advice and consent of the senate appointed, to serve at the pleasure of the governor.").

unique to Wisconsin.[9] And when an administrative agency acts (other than when it is exercising its borrowed rulemaking function), it is exercising executive power. See, e.g., Jones v. United States, 137 U.S. 202, 217 (1890) ("[T]here can be no doubt that it [the power "conferred on the president of the United States"] may be declared through the department of state, whose acts in this regard are in legal contemplation the acts of the president." (emphasis added)); Wolsey v. Chapman, 101 U.S. 755, 769 (1879) ("[T]he acts of the heads of departments, within the scope of their powers, are in law the acts of the President."); Mistretta v. United States, 488 U.S. 361, 424 (1989) (Scalia, J., dissenting) ("Although the Constitution says that '[t]he executive Power shall be vested in a President of the United States of America,' [U.S. Const.] Art. II, § 1, it was never thought that the President would have to exercise that

---

[9] See, e.g., Town of Walkerton v. New York, C. & St. L. R. Co., 18 N.E. 2d 799, 803 (Ind. 1939) ("Under our form of government an administrative agency belongs to the executive department."); Barrett v. Tennessee Occupational Safety & Health Review Comm'n, 284 S.W. 3d 784, 789 (Tenn. 2009) ("Administrative agencies are part of the executive branch of government."); Meyers v. Chapman Printing Co., 840 S.W. 2d 814, 820 (Ky. 1992) ("Decisionmaking performed by an administrative agency is an executive function."); Judges of 74th Judicial Dist. v. Bay Cty., 190 N.W. 2d 219, 226 (Mich. 1971) ("Administrative agencies are a part of the executive branch of government. While they often act in a quasi-judicial capacity, it is recognized that they are established to perform essentially executive functions."); Matter of Kallen, 455 A. 2d 460, 463 (N.J. 1983) ("Administrative agencies are the arms of the executive branch of government that implement the laws passed by the Legislature."); Muddy Boys, Inc. v. Dep't of Commerce, 440 P. 3d 741, 747 (Ut. Ct. App. 2019) ("[A]dministrative agencies are part of the executive.").

10

power personally. He may generally authorize others to exercise executive powers, with full effect of law, in his place." (alterations in original)).; Frank B. Cross, Executive Orders 12,291 and 12,498: A Test Case in Presidential Control of Executive Agencies, 4 J.L. & Pol. 483, 507 (1988) ("Obviously, one person cannot execute all the functions of government personally. In order to carry out his constitutional responsibility, the president must delegate his authority to other executive officers.").

¶98 In addition to the executive power that agencies exercise as a consequence of their placement in the executive branch, they also exercise some limited legislative power. This second type of authority depends entirely on the legislature's delegation of the power to promulgate rules that have the force and effect of law. Wis. Stat. § 227.11(2) ("Rule-making authority is expressly conferred on an agency[.]"); Kieninger v. Crown Equip. Corp., 2019 WI 27, ¶16 n.8, 386 Wis. 2d 1, 924 N.W.2d 172 ("Administrative rules enacted pursuant to statutory rulemaking authority have the force and effect of law in Wisconsin." (quoted source omitted)). We have recognized before that when an agency promulgates a rule, it is exercising "a legislative power[.]" Koschkee, 387 Wis. 2d 552, ¶39. An agency, however, "has no inherent constitutional authority to make rules . . . ." Martinez v. DILHR, 165 Wis. 2d 687, 698, 478 N.W.2d 582 (1992). To the extent it exists, it comes solely through express delegation from the legislature. Because this

11

capability is only on loan,[10] agencies necessarily "remain subordinate to the legislature with regard to their rulemaking authority." Koschkee, 387 Wis. 2d 552, ¶18.

¶99 The constitutional authority of the executive encompasses determining what the law requires as well as applying it (preferably in that order). Because the executive's power is supplemented by a legislatively-delegated authority to promulgate rules that have the force and effect of law, we must determine what manner of authority an agency uses to create guidance documents before we can evaluate the legislature's right to control them. If it is a delegated rulemaking authority, then the legislature's power to dictate their content and manner of promulgation would be almost beyond question. If, however, the authority to create guidance documents is executive, then we must consider whether the legislature's reach extends far enough to control how members of the executive branch explain statutes and provide guidance or advice about how administrative agencies are likely to apply them.

¶100 Our analysis on this point necessarily begins with the undisputed understanding that a guidance document does not have the force or effect of law. The Act explicitly says so: "A guidance document does not have the force of law and does not provide the authority for implementing or enforcing a standard, requirement, or threshold, including as a term or condition of any license." 2017 Wis. Act. 369, § 38 (Wis. Stat.

---

[10] "As a legislative creation, [an agency's] . . . rule-making powers can be repealed by the legislature." Martinez v. DILHR, 165 Wis. 2d 687, 698, 478 N.W.2d 582 (1992).

12

§ 227.112(3)). That's an important place to start because right away it establishes that, unlike a rule,[11] the executive branch needs no borrowed authority from the legislature to create a guidance document. In fact, the executive was creating them long before the legislature passed the Act and gave them that name. The Act implicitly recognizes this by not even purporting to delegate the authority to create such documents to the executive——it assumed the power already resided there.

¶101 Having established that guidance documents are not rules, we must determine what manner of thing they are. The Act describes them as:

> [A]ny formal or official document or communication issued by an agency, including a manual, handbook, directive, or informational bulletin, that does any of the following:
>
> 1. Explains the agency's implementation of a statute or rule enforced or administered by the agency, including the current or proposed operating procedure of the agency.
>
> 2. Provides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency, if that guidance or advice is likely to apply to a class of persons similarly affected.

2017 Wis. Act 369, § 31 (Wis. Stat. § 227.01(3m)(a)1.-2.).[12]

---

[11] Koschkee v. Taylor, 2019 WI 76, ¶18, 387 Wis. 2d 552, 929 N.W.2d 600 (Executive "agencies ha[ve] no inherent constitutional authority to make rules[.]" (some alterations in original)).

[12] The Act also describes what a guidance document is not:

> (b) "Guidance document" does not include any of the following:

13

1. A rule that has been promulgated and that is currently in effect or a proposed rule that is in the process of being promulgated.

2. A standard adopted, or a statement of policy or interpretation made, whether preliminary or final, in the decision of a contested case, in a private letter ruling under s. 73.035, or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts.

3. Any document or activity described in sub. (13) (a) to (zz), except that "guidance document" includes a pamphlet or other explanatory material described under sub. (13) (r) that otherwise satisfies the definition of "guidance document" under par. (a).

4. Any document that any statute specifically provides is not required to be promulgated as a rule.

5. A declaratory ruling issued under s. 227.41.

6. A pleading or brief filed in court by the state, an agency, or an agency official.

7. A letter or written legal advice of the department of justice or a formal or informal opinion of the attorney general, including an opinion issued under s. 165.015 (1).

8. Any document or communication for which a procedure for public input, other than that provided under s. 227.112 (1), is provided by law.

9. Any document or communication that is not subject to the right of inspection and copying under s. 19.35(1).

2017 Wis. Act. 369, § 31 (Wis. Stat. § 227.01(3m)(b)1.-9.).

14

¶102 The Act's plain language allows us to discern the following essential attributes of guidance documents.[13]  They are not law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions.  They simply "explain" statutes and rules, or they "provide guidance or advice" about how the executive branch is "likely to apply" a statute or rule.  They impose no obligations, set no standards, and bind no one.  They are communications <u>about</u> the law——they are not the law itself.  They communicate intended applications of the law——they are not the actual execution of the law.  Functionally, and as a matter of law, they are entirely inert.  That is to say, they represent nothing more than the knowledge and intentions of their authors.  It is readily apparent, therefore, that the executive need not borrow any legislative authority, nor seek the legislature's permission, to create guidance documents.  It could hardly be otherwise.  This creative power is necessarily inherent to the executive because no other branch of government has even the

---

[13] <u>State ex rel. Kalal v. Circuit Court for Dane Cty.</u>, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 ("Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning.").

15

theoretical ability to know the executive's mind with respect to the law he is to execute.[14]

B. May the Legislature Regulate the Executive's Guidance Documents?

¶103 Because the executive branch has the native authority to create and disseminate guidance documents, we must next determine whether the legislature may nonetheless prescribe the content or method of disseminating such documents. The answer depends on whether the creation of guidance documents represents an exercise of the executive's core function, or merely a power shared with the legislature.

> The separation of powers doctrine "envisions a system of separate branches sharing many powers while jealously guarding certain others, a system of 'separateness but interdependence, autonomy but reciprocity.'" State ex rel. Friedrich v. Circuit Court for Dane Cty., 192 Wis. 2d 1, 14, 531 N.W.2d 32 (1995) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). "The constitutional powers of each branch of government fall into two categories: exclusive powers and shared powers." State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999). "Shared powers lie at the intersections of these exclusive core constitutional powers," and "[t]hese '[g]reat borderlands of power' are not exclusive to any one branch." Id. at 643-44 (quoting Friedrich, 192 Wis. 2d at 14; see also State v. Holmes, 106 Wis. 2d 31, 42-43, 315 N.W.2d 703 (1982). Although the "branches may exercise [shared] power within these borderlands," they "may [not]

---

[14] Chief Justice Roggensack suggests that this is a "change in the law[.]" See Chief Justice Roggensack's concurrence/dissent, ¶150. But she does not say what it is a change from. We have never said that the creative power to make a guidance document resides somewhere other than the executive branch, and the Chief Justice cites no authority suggesting we have.

unduly burden or substantially interfere with another branch." <u>Horn</u>, 226 Wis.2d at 644.

<u>Tetra Tech EC, Inc.</u>, 382 Wis. 2d 496, ¶46 (alterations in original).

¶104 A branch's core powers are those that define its essential attributes.[15] With respect to these, we have previously recognized that "[e]ach branch has exclusive core constitutional powers, into which the other branches may not intrude." <u>Flynn v. DOA</u>, 216 Wis. 2d 521, 545, 576 N.W.2d 245. "Core powers," as has been previously observed, "are not for sharing." <u>Tetra Tech EC, Inc.</u>, 382 Wis. 2d 496, ¶47. "Shared powers[, however,] lie at the intersections of these exclusive core constitutional powers," and "[t]hese '[g]reat borderlands of power' are not exclusive to any one branch." <u>Horn</u>, 226 Wis. 2d at 643-44 (quoting <u>Friedrich</u>, 192 Wis. 2d at 14 (alterations in original)). "Although the 'branches may exercise [shared] power within these borderlands,' they 'may [not] unduly burden or substantially interfere with another branch.'" <u>Tetra Tech EC, Inc.</u>, 382 Wis. 2d 496, ¶46 (quoting <u>Horn</u>, 226 Wis. 2d at 644 (alterations in original)). So if

---

[15] The Chief Justice's concurrence says there is no basis for this definition of core powers. <u>See</u> Chief Justice Roggensack's concurrence/dissent, ¶152. That is simply not true; the constitution itself constitutes the source. First, we know that "[e]ach branch has exclusive core constitutional powers[.]" <u>State v. Horn</u>, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999). These core powers are the "zones of authority <u>constitutionally established</u> for each branch of government[.]" <u>State ex rel. Fiedler v. Wisconsin Senate</u>, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990). In other words, a core power is a power vested by the constitution that distinguishes that branch from the other two.

17

guidance documents fall somewhere in the realm of shared powers, the legislature would conceivably retain some claim of right to govern their content and dissemination.  But if they lie within the executive's core authority, the legislature must retain a constitutionally-respectful distance.

¶105 We conclude that the creation and dissemination of guidance documents fall within the executive's core authority.  Guidance documents, as the legislature has defined them, necessarily exist outside of the legislature's authority because of what they are and who creates them.  As we explained above, a guidance document is something created by executive branch employees through the exercise of executive authority native to that branch of government.  Creation of a guidance document requires no legislative authority and no legislative personnel. A guidance document cannot affect what the law is, cannot create a policy, cannot impose a standard, and cannot bind anyone to anything.

¶106 This is all true because guidance documents merely explain statutes and rules, or provide guidance or advice about how the executive is likely to apply them.  Thought must precede action, of course, and guidance documents are simply the written record of the executive's thoughts about the law and its execution.  They contain the executive's interpretation of the laws, his judgment about what the laws require him to do. Because this intellectual homework is indispensable to the duty to "take care that the laws be faithfully executed," Wis. Const. art. V, § 4, it is also inseparable from the executive's

18

constitutionally-vested power. It is all one, and has been one since the creation of our tripartite form of government centuries ago. See Hamilton, supra, ¶96; see also Kendall v. U.S. ex rel. Stokes, 37 U.S. 524, 600 (1838) ("If, therefore, the executive be clearly satisfied as to the meaning of such a law, it is his bounden duty to see that the subordinate officers of his department conform with fidelity to that meaning; for no other execution, however pure the motive from which it springs, is a faithful execution of the law." (emphasis added)); Tetra Tech EC, Inc., 382 Wis. 2d 496, ¶53 ("The executive must certainly interpret and apply the law; it would be impossible to perform his duties if he did not. After all, he must determine for himself what the law requires (interpretation) so that he may carry it into effect (application)."); State v. Whitman, 196 Wis. 472, 220 N.W. 929 (1928) ("Every executive officer in the execution of the law must of necessity interpret it in order to find out what it is he is required to do.").

¶107 Sections 33 and 38 of the Act are problematic, therefore, because they insert the legislature as a gatekeeper between the analytical predicate to the execution of the laws and the actual execution itself. The legislature may see itself as a benign gatekeeper between the two, but that is entirely irrelevant. The question is whether it may install a gate at all. If the legislature can regulate the necessary predicate to executing the law, then the legislature can control the execution of the law itself. Such power would demote the executive branch to a wholly-owned subsidiary of the

19

legislature. Capturing the executive's ability to communicate his knowledge, intentions, and understanding of the laws he is to execute makes him a drone without the energy or independent wherewithal to act as a co-equal member of government.[16]

¶108 The legislature may enact the laws the executive is duty-bound to execute. But it may not control his knowledge or intentions about those laws. Nor may it mute or modulate the communication of his knowledge or intentions to the public. Because there are no set of facts pursuant to which § 33 (to the extent it applies to guidance documents) and § 38 would not impermissibly interfere with the executive's exercise of his core constitutional power, they are in that respect facially unconstitutional.

C. Challenges to The Remaining Guidance Document Provisions

¶109 The plaintiffs' challenge to the guidance document provisions of 2017 Wis. Act 369 goes beyond §§ 33 and 38, but as it reaches §§ 31, 65-71, and 104-05, the focus of their argument becomes so diffuse that the justification for declaring them unconstitutional appears to rely almost entirely on their

---

[16] The problem is especially acute because this regulation on the executive's pre-execution analysis and communication is infinitely recursive. That is, if he wished to publish a bulletin about his understanding of 2017 Wis. Act 369, §§ 33 and 38 or how he intends to implement them, that bulletin itself would have to go through the legislatively-mandated pre-clearance procedure. And if he wished to communicate about the communication he was required to submit to the legislative mandate, that communication too would be subject to pre-clearance. Ultimately, the Act's guidance document provisions prohibit the executive branch of government from publicizing his thoughts, knowledge, and intentions about the laws he is to execute without first surmounting the legislature's hurdles.

association with §§ 33 and 38. As we now explain, the plaintiffs have not established that these remaining provisions "cannot be enforced 'under any circumstances.'" Mayo, 383 Wis. 2d 1, ¶24 (quoted source omitted).

¶110 Section 31 of 2017 Wis. Act 369 defines the term "guidance document" (see supra, ¶90). It is conceivable that the legislature might introduce an unneeded and even unwanted entry into our legal glossary, but the parties do not describe how that could even potentially impose upon or detract from any part of the executive's vested authority. SEIU's brief acknowledged creation of this definition, noted the circuit court's global lack of faith in the utility of any of the guidance document provisions, and asserted that this provision (in conjunction with all the other guidance document provisions) "improperly intrude on the Governor's authority to implement state law." The Governor said pretty much the same thing, and the Attorney General did not specifically mention § 31 at all. The parties, therefore, have identified no basis for asserting that there is no constitutional application of § 31, and we see none.

¶111 Sections 65-71[17] make guidance documents reviewable by the courts in the same fashion as administrative rules. Each of

_____

[17] Sections 65 to 71 of the Act provide:

Section 65. 227.40 (1) of the statutes is amended to read: 227.40 (1) Except as provided in sub. (2), the exclusive means of judicial review of the validity of a rule or guidance document shall be an action for declaratory judgment as to the validity of the rule or guidance document brought in the circuit court for the county where the party asserting the invalidity of the

rule or guidance document resides or has its principal place of business or, if that party is a nonresident or does not have its principal place of business in this state, in the circuit court for the county where the dispute arose. The officer or other agency whose rule or guidance document is involved shall be the party defendant. The summons in the action shall be served as provided in s. 801.11 (3) and by delivering a copy to that officer or, if the agency is composed of more than one person, to the secretary or clerk of the agency or to any member of the agency. The court shall render a declaratory judgment in the action only when it appears from the complaint and the supporting evidence that the rule or guidance document or its threatened application interferes with or impairs, or threatens to interfere with or impair, the legal rights and privileges of the plaintiff. A declaratory judgment may be rendered whether or not the plaintiff has first requested the agency to pass upon the validity of the rule or guidance document in question.

Section 66. 227.40 (2) (intro.) of the statutes is amended to read: 227.40 (2) (intro.) The validity of a rule or guidance document may be determined in any of the following judicial proceedings when material therein:

Section 67. 227.40 (2) (e) of the statutes is amended to read: 227.40 (2) (e) Proceedings under s. 66.191, 1981 stats., or s. 40.65 (2), 106.50, 106.52, 303.07 (7) or 303.21 or ss. 227.52 to 227.58 or under ch. 102, 108 or 949 for review of decisions and orders of administrative agencies if the validity of the rule or guidance document involved was duly challenged in the proceeding before the agency in which the order or decision sought to be reviewed was made or entered.

Section 68. 227.40 (3) (intro.) of the statutes is renumbered 227.40 (3) (ag) and amended to read: 227.40 (3) (ag) In any judicial proceeding other than one set out above under sub. (1) or (2), in which the invalidity of a rule or guidance document is material to the cause of action or any defense thereto, the assertion of such that invalidity shall be set forth in the pleading of the party so maintaining the invalidity of such the rule or guidance document in that proceeding. The party so asserting the invalidity of such the rule or guidance document

22

shall, within 30 days after the service of the pleading in which the party sets forth such the invalidity, apply to the court in which ~~such~~ the proceedings are had for an order suspending the trial of ~~said~~ the proceeding until after a determination of the validity of ~~said~~ the rule or guidance document in an action for declaratory judgment under sub. (1) ~~hereof~~.

Section 69. 227.40 (3) (a) of the statutes is renumbered 227.40 (3) (ar) and amended to read: 227.40 (3) (ar) Upon the hearing of ~~such~~ the application, if the court is satisfied that the validity of ~~such~~ the rule or guidance document is material to the issues of the case, an order shall be entered staying the trial of said proceeding until the rendition of a final declaratory judgment in proceedings to be instituted forthwith by the party asserting the invalidity of ~~such~~ the rule or guidance document. If the court ~~shall find~~ finds that the asserted invalidity of ~~a~~ the rule or guidance document is not material to the case, an order shall be entered denying the application for stay.

Section 70. 227.40 (3) (b) and (c) of the statutes are amended to read: 227.40 (3) (b) Upon the entry of a final order in ~~said~~ the declaratory judgment action, it shall be the duty of the party who asserts the invalidity of the rule or guidance document to formally advise the court of the outcome of the declaratory judgment action so brought as ordered by the court. After the final disposition of the declaratory judgment action the court shall be bound by and apply the judgment so entered in the trial of the proceeding in which the invalidity of the rule or guidance document is asserted.

(c) Failure to set forth the invalidity of a rule or guidance document in a pleading or to commence a declaratory judgment proceeding within a reasonable time pursuant to ~~such~~ the order of the court or to prosecute ~~such~~ the declaratory judgment action without undue delay shall preclude ~~such~~ the party from asserting or maintaining ~~such~~ that the rule or guidance document is invalid.

Section 71. 227.40 (4) (a) of the statutes is amended to read: 227.40 (4) (a) In any proceeding pursuant

23

these sections does little more than add the term "guidance document" to various subsections of Wis. Stat. § 227.40, which formerly applied only to rules.  The parties do not make any particularized argument against judicial review of guidance documents, and we see no reason why the legislature's provision for such review differs so profoundly from judicial review of administrative rules that the former would necessarily be unconstitutional under any circumstances, while the latter is not.  Mayo, 383 Wis. 2d 1, ¶24 (A statute is facially unconstitutional only when it "cannot be enforced 'under any circumstances.'" (quoted source omitted)).

¶112 The final two provisions of 2017 Wis. Act 369 that implicate guidance documents are §§ 104 and 105.  Section 104 establishes the initial applicability of § 33.  It says:  "(1) Agency publications.  The treatment of [Wis. Stat. § ]227.05 with respect to printed publications first applies to guidance documents, forms, pamphlets, or other informational materials that are printed 60 days after the effective date of this subsection."  Section 105 is similarly unremarkable in that it simply determines the effective date of the Act's provisions: "(1) Agency publications.  The treatment of [§] 227.05 and

---

to this section for judicial review of a rule or guidance document, the court shall declare the rule or guidance document invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was promulgated or adopted without compliance with statutory rule-making or adoption procedures.

2017 Wis. Act. 369, §§ 65-71 (amending Wis. Stat. § 227.40).

24

Section 104 (1) takes effect on the first day of the 7th month beginning after publication." None of the respondents provide any reason to believe these provisions are facially unconstitutional, and no such reason immediately presents itself to us.

### IV. THE CONSEQUENCES

¶113 Sections 33 and 38 are before us today on different procedural footings. The latter is here on a straightforward review of the circuit court's denial of a motion to dismiss. Section 33, however, presents in a somewhat awkward posture for two reasons. First SEIU does not claim this provision is unconstitutional. That allegation appears in the Governor's cross-claim. The Legislative Defendants' answer to the cross-claim asserts the Governor does not have standing to challenge the constitutionality of a law. However, the Legislative Defendants did not advance that argument in this court, and they fully briefed their position on the section's constitutionality. Because standing is a matter of judicial prudence, Milwaukee District Council 48 v. Milwaukee County, 2001 WI 65, ¶38 n.7, 244 Wis. 2d 333, 627 N.W.2d 866 ("[S]tanding is generally a matter of judicial policy rather than a jurisdictional prerequisite."), and it was not argued here, we will not apply it. State v. Chamblis, 2015 WI 53, ¶54 n.15, 362 Wis. 2d 370, 864 N.W.2d 806 ("We choose not to address that argument because it was not briefed by the parties."). We do not opine on whether the Governor actually has standing; we simply do not address it.

25

¶114 The second postural oddity with respect to § 33 is that we are reviewing it in the context of determining whether the circuit court properly issued a temporary injunction against its enforcement. That is to say, this section was not included in the Legislative Defendants' motion to dismiss. That means our task is to determine whether the circuit court erroneously exercised its discretion in issuing the temporary injunction. Such interlocutory relief is available when: "(1) the movant is likely to suffer irreparable harm if a temporary injunction is not issued; (2) the movant has no other adequate remedy at law; (3) a temporary injunction is necessary to preserve the status quo; and (4) the movant has a reasonable probability of success on the merits." Milwaukee Deputy Sheriffs' Ass'n, 370 Wis. 2d 644, ¶20 (citing Werner, 80 Wis. 2d at 520-21).

¶115 We conclude the circuit court did not erroneously exercise its discretion in issuing the temporary injunction with respect to §§ 33 and 38 because those provisions are unconstitutional, and it would therefore be unlawful to enforce them. Justice Hagedorn, however, does not believe this ends the inquiry: "The majority could have determined the claim is likely to be successful, and gone on to analyze the remaining factors." Justice Hagedorn's concurrence/dissent, ¶211 n.6.

¶116 Justice Hagedorn acknowledges that one aspect of the temporary injunction test is the likelihood of success on the merits. The merits in this case depend entirely on whether the challenged portions of the Act are unconstitutional. Consequently, our review unavoidably requires us to inquire into

26

the constitutionality of the enjoined provisions, including §§ 33 and 38.  We performed that inquiry, and have concluded that both of those provisions are unconstitutional.

¶117 Justice Hagedorn's insistence that we analyze the remaining factors makes sense only if there are circumstances under which it would be appropriate to continue enforcing a law we have already decided is unconstitutional.  If we concluded that the movant would not suffer irreparable harm, would that make it acceptable for the executive to enforce an unconstitutional law?  If there were an alternative legal remedy, would we tell the circuit court that the continued application of an unconstitutional law is legally warranted?  If the status quo would not change without a temporary injunction, would that mean the unconstitutional law could remain in effect?  Obviously not.

¶118 Justice Hagedorn's concerns grow out of a failure to account for the supreme court's position in the judiciary.  If we were the circuit court, or the court of appeals, he would be correct—consideration of each of the remaining factors would be necessary because the relief sought would be interlocutory.  That is to say, when the case was pending in the circuit court, the merits of the plaintiffs' claims were in question because a declaration of unconstitutionality was subject to judicial review.  Once this court opines on a state statute's fidelity to the state constitution, however, the ultimate result is no longer in doubt because there is no further judicial review of our decision (unless it implicates federal law, which this does

27

not).[18] So the only purpose in considering the remaining temporary injunction factors would be if we would consider remanding the case to the circuit court to decide whether a law we declared unconstitutional should nevertheless be enforced. We believe such a result would be anomalous and contrary to law.

¶119 Accordingly, we conclude that the circuit court erred in denying the Legislative Defendants' motion to dismiss with respect to 2017 Wis. Act 369, §§ 31, 65-71, and 104-05 because the plaintiffs have not established that they cannot be enforced under any set of circumstances. Further, because the interlocutory relief rested on their asserted unconstitutionality, which we have now rejected, the temporary injunction can have no further force or effect with respect to those provisions. However, because we have declared that 2017 Wis. Act 369, §§ 33 and 38 are unconstitutional, there can be no reason to further consider whether the circuit court erroneously exercised its discretion in granting the temporary injunction with respect to these provisions.

## V. THE DISSENTS

¶120 Justice Hagedorn says our reasoning "is wrong on the facts and runs contrary to the plain language of the laws the legislature passed. This means its constitutional conclusion is similarly faulty." Justice Hagedorn's concurrence/dissent,

---

[18] J. C. Penney Co. v. Wisconsin Tax Comm'n, 238 Wis. 69, 72, 298 N.W. 186 (1941), overruled in part on different grounds by Wisconsin Dep't of Taxation v. Nash-Kelvinator Corp., 250 Wis. 533, 27 N.W.2d 889 (1947) ("As we understand the law, our construction of the state statute is conclusive upon the Supreme Court of the United States.").

¶191. But he never identifies any error in our understanding of the laws the legislature passed. In fact, there appears to be no disagreement at all with respect to what §§ 33 and 38 actually do. Instead, the disagreement is over what the constitution requires. It is also about Justice Hagedorn's misunderstanding of what we said about the constitution, which he mischaracterizes as having rejected §§ 33 and 38 "on the thinnest of foundations——its misguided determination that guidance documents regulate executive branch thought." Id. At the risk of repeating what we have already said, this is not just about regulating the executive's thought——it is about interfering in the relationship between the executive branch's interpretation of the law, its communication of that interpretation to the public, and its execution of the law.

¶121 Then, after selectively ignoring our analysis, Justice Hagedorn announces that "[g]uidance documents regulate executive branch communications with the public——a permissible and longstanding area of legislative regulation." Id. But how would he know this is constitutionally permissible? His opinion makes no effort to determine what lies within the executive branch's core authority, or how the statutory definition of "guidance document" might relate to that authority. He simply asserts that "[b]y enacting the guidance document provisions, the legislature is carrying out its function of determining what the law should be by passing laws pursuant to its constitutional authority." Id., ¶198. If this is the correct standard for determining whether the legislature invaded the executive's

29

exclusive zone of authority (and his opinion contains no further exploration of this concept), then there can be no structural limitations on the scope of laws the legislature may adopt. Of course §§ 33 and 38 are laws the legislature adopted under its constitutional authority to make the law. That is not the question. The question is whether, in making this law, the legislature legislated on something the constitution says it may not.

> The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law; if the latter part be true, then written Constitutions are absurd attempts on the part of the people to limit a power in its own nature illimitable.

Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803). Ultimately, because Justice Hagedorn offers no constitutional analysis, his opinion is little more than an invitation to place our faith in his personal pronouncement about what is and is not within the executive branch's core authority.

¶122 We part ways with Justice Hagedorn's belief that the legislature's power to command the executive branch to create and disseminate a document is coextensive with the power to ban the executive branch from creating and disseminating a document unless it complies with the legislature's content (§ 33) and publication (§ 38) requirements. There is no logical correlation between those two concepts, and Justice Hagedorn's opinion does nothing to link them. Nonetheless, the bulk of his

30

opinion is simply an extended discussion of statutes that require the executive branch to create certain documents, followed by his assumption that this confers on the legislature the power to prevent the executive branch from creating and disseminating documents unless they comply with the legislature's content and publication requirements. Justice Hagedorn introduces this part of his analysis by accusing the court of resting its analysis on "its mistaken interpretation of what guidance documents are." Justice Hagedorn's concurrence/dissent, ¶192. He then proceeds to essentially repeat the statute's definition of guidance documents, a definition on which we based our entire analysis. As relevant here, a guidance document "[e]xplains the agency's implementation of a statute or rule[,]" or "[p]rovides guidance or advice with respect to how the agency is likely to apply a statute or rule[.]" See 2017 Wis. Act 369, § 31 (Wis. Stat. § 227.01(3m)(a)1.-2.). Because the executive branch (through its agencies) creates and issues guidance documents, it necessarily follows that they contain the executive's explanations, or the executive's guidance or advice. Naturally, that means the explanations, guidance, and advice must originate in the minds of executive branch employees, which further means guidance documents are nothing but the written manifestations of the executive branch's thought processes. But if the legislature can "determine the content" of a guidance document, then it is no longer the executive's explanation, or the executive's guidance or advice——it is the legislature's

explanation, guidance, or advice. So, to the extent the legislature commands production of a document, or determines the content of a guidance document, it simply is no longer a guidance document. The failure to make that distinction explains his assertions that "determining the content and timing of executive branch communications are not the exclusive prerogative of the executive," and that "nothing in the constitution suggests the legislature cannot, at least in some circumstances, make laws that determine the content of certain formal communications from the government to the public." Justice Hagedorn's concurrence/dissent, ¶198. His assertions are correct with respect to documents the legislature has the power to command. But they are not correct with respect to guidance documents, because having not been commanded, they belong entirely to the executive. Nothing in Justice Hagedorn's opinion describes how the power to command the former translates into the power to ban the latter unless they comply with the legislature's content and publication requirements.

¶123 Justice Hagedorn says he does not see why there is any difference between: (a) commanding the creation of a document and; (b) preventing the executive branch from creating a certain class of documents unless they comply with the legislature's requirements. "For example," he says, "if an executive agency must by legislative command create a youth hunting bulletin and cite the relevant law, this is a reflection of the executive branch's understanding of the law no less than if the executive chooses to do the same thing in the absence of such a command."

32

Id., ¶206.  In the absence of a legislative command, of course, the document would belong to the executive department.  Justice Hagedorn's reasoning works only if the executive branch has no authority to create or disseminate guidance documents, and depends on legislative permission to do so.  This, of course, is not true and Justice Hagedorn does not even attempt to demonstrate otherwise.

¶124 But the really instructive aspect of Justice Hagedorn's discussion of this bulletin is its revelation that his paramount concern is with the amount of the executive's authority the legislature pre-empts, rather than with whether the legislature may pre-empt it at all.  He says "Wisconsin Stat. § 227.05 requires that a guidance document cite the applicable laws.  But the majority opinion holds that this is too much for the legislature to demand of the executive branch because it controls executive branch thought."  Id., ¶210.  The question is not whether the legislature demanded too much, but whether it had the right to demand at all.  Now, it is obviously true that the legislature could require the Department of Natural Resources to issue a bulletin citing the law applicable to the youth hunting season.  It would simply need to pass a law mandating such a bulletin and require the citation.  But that authority does not translate into the power to ban executive guidance documents on that subject unless they meet the legislature's content and process requirements.

¶125 To these errors Justice Hagedorn adds a metaphysical impossibility.  He says the legislature can, and regularly does,

33

co-opt the executive's thought processes that go into creating what are now known as guidance documents:  "The legislature has long regulated . . . the executive branch's understanding of what the law is . . . and how the executive branch intends to execute the law going forward."  Justice Hagedorn's concurrence/dissent, ¶199.  That, of course, is not and cannot be true.  The legislature may tell executive branch employees what the law is and what to do with it, but regulating the employees' understanding of the law or their intentions with respect to the execution of the law is entirely beyond the legislature's reach——not as a matter of separation of powers, but as an epistemological recognition that one person cannot control another's understanding or intentions.[19]  He says "[t]he clearest example [of this phenomenon] may be the mandatory creation of certain executive branch reports," such as Wis. Stat. § 15.04(1)(d), which he says requires the executive

---

[19] Another epistemological error shows up in Justice Hagedorn's reversal of our observation that "[t]he constitutional authority of the executive encompasses determining what the law requires as well as applying it (preferably in that order)." Supra, ¶99.  He says this is "wrong on the facts, and therefore, wrong on the law" because guidance documents "are the result of, rather than the necessary predicate to, executing the law." Justice Hagedorn's concurrence/dissent, ¶203.  But this formulation——act first, do the intellectual homework later——cannot possibly be correct. Creating a guidance document does not reflect the execution of any law.  It is simply a written record of the executive branch's thoughts about how it will——future tense——execute the law, or how others ought to——future tense——conform themselves to the law.  In the relationship between guidance documents and execution of the law, therefore, guidance documents come first as a definitional and epistemological matter.

34

agencies to "include what the agency has done, how it operates, and its goals and objectives moving forward." Justice Hagedorn's concurrence/dissent, ¶199. Commanding the executive to divulge its understanding of the law and intentions with respect to the law is not the same thing as regulating the executive's understanding and intentions. So the dispositive difference between this and the guidance document provisions is really not that hard to spot. The legislature may command the executive to speak, and even provide content to include in that speech. But absent a command to produce a document, the document is the executive's own, and the legislature cannot, as an epistemological matter, control how the executive understands the law he is addressing, or his intentions with respect to that law. Justice Hagedorn could probably provide an endless list of examples in which he believes this type of legislative control over the executive branch would be a good idea and minimally intrusive (and he makes a good start on it (see id., ¶207)), but that would be to entirely miss the point. With respect to core powers, the constitutionality of the legislature's reach into the executive branch is not determined by the wisdom of what it would do once there, or the relative lack of discomfort to those exercising core powers. It is determined by whether the legislature is exercising that control at all. But for Justice Hagedorn, there is no difference between: (a) a mandatory report describing an agency's understandings and intentions and; (b) a law that attempts to regulate the executive branch's "understanding of what the law is" and how it "intends to

35

execute the law." Id., ¶199. The former is clearly lawful and achievable; the latter is impossible because the executive branch's thought processes about the implementation of the law, and its guidance and advice, are (by definition) its own.

¶126 These are some of the granular reasons we believe Justice Hagedorn's analysis is incorrect. But taking a step back to get an overall picture of the legislature's assertion of power in §§ 33 and 38 reveals why, as a structural matter, it simply cannot work. To the extent Justice Hagedorn's opinion contains a constitutional analysis, it rests solely on the proposition that because the legislature can command the executive to produce certain documents, it may ban those that do not follow the legislature's content and publication requirements. Because his analysis focuses on the legislature's power, without any reference to what might lie within the executive's core authority, there is no reason his analysis would not be equally applicable to the judiciary. Would Justice Hagedorn be as sanguine about §§ 33 and 38 if they applied to us? Would he pick up our "constitutional penalty flag," Justice Hagedorn's concurrence/dissent, ¶190, if the legislature told us that, prior to publishing our opinions, we must submit them to a public comment process, and then take those comments into consideration before finalizing and publishing our work? Would he find it constitutionally unobjectionable if the legislature were to mandate that "draft [court opinions] be posted for 21 days before they are officially issued"? Id., ¶211. Would he quizzically ask why "[p]osting a draft before issuance of some

[court opinions] is now denominated a regulation of [judicial] branch thought and invades core [judicial] power"? Id. Would he say that "[t]he legislature is not invading the [judiciary]'s ability to read the law or think about the law when it regulates how [the courts] officially communicate to the public about what the law is and where in the statutes the law may be found"? Id., ¶204. Would he conclude that the legislature may mandate the content and publication process of our opinions because "[b]y the time [the court's opinion] has been reduced to writing, the thinking and analyzing has been done"? Id., ¶203. Would he be mollified if we could reduce the pre-clearance time period to something inconsequential?

¶127 One could do this with the entirety of Justice Hagedorn's analysis. And even though the answers are so obvious they make the questions rhetorical, he has no substantive response to any of this. But he does reject it on the sweeping basis that "the legislature's relationship to the judiciary is far different than its relationship to the branch charged with the constitutional duty to execute the laws the legislature passes." Id., ¶204 n.5. A long time ago the notion that the branches of government are co-equal passed into the realm of common knowledge. But Justice Hagedorn's assertion, coming as it does with no explanation, carries a suggestion that the executive is less than equal in its relationship with the legislature.[20] Perhaps it is because his guiding principle (as

---

[20] Justice Hagedorn apparently misses the import of these illustrations. He says:

37

far as he says in his opinion, at least) is simply that, so long as "the legislature is carrying out its function of determining what the law should be by passing laws pursuant to its constitutional authority," there are no structural limitations on the scope of that law. Id., ¶198. He certainly provides no analysis of the legislature's limits, nor does he even attempt to describe what might be included in the executive's core powers. And yet without doing any of this work, he says "[our] analysis falls far short of the mark," id., ¶201, even though the constitutional principles informing our analysis are well-documented and fundamental to the separation of powers established under our constitution more than 170 years ago.

*

¶128 And now a few closing words about Chief Justice Roggensack's partial concurrence and partial dissent. She says our analysis is flawed because it does not recognize that the legislature has plenary authority over administrative agencies, and that they may do nothing without legislative permission.

---

> Moreover, the majority's criticisms ring hollow because the majority says the legislature can pass laws that do the very things it cites; the legislature just has to enact laws regarding specific documents (create a youth hunting bulletin, for example). So the majority's criticisms apply just as forcefully to its own reasoning, which is to say, not much at all.

Justice Hagedorn's concurrence/dissent, ¶204 n.5. The whole point of putting the "very things" we cite in the judicial context is to illustrate why the legislature may not do what Justice Hagedorn thinks it may. So, to be clear, the illustrations identify things Justice Hagedorn says the legislature may do with respect to the executive, but which we say the legislature may not do.

38

This is so, she says, because of the nature of administrative agencies within our constitutional structure:  "[A]dministrative agencies have no constitutional core powers because they are not a branch of government in our tripartite system."  Chief Justice Roggensack's concurrence/dissent, ¶148.  She also asserts that we have previously said that administrative agencies can do nothing but what the legislature tells them to do:  "[A]dministrative agencies are creations of the legislature and that they can exercise only those powers granted by the legislature."  Id., ¶150 (quoting Martinez, 165 Wis. 2d at 697).

¶129 But this is only partly true.  With respect to what agencies are, it is certainly true that they are not "a branch of government" in the sense of being discrete from the standard three.  But as we said just last term, "they are considered part of the executive branch."  Koschkee, 387 Wis. 2d 552, ¶14.  The Chief Justice agrees, or at least she did last year.  See id. ("[A]gencies are part of the executive branch once established[.]").  And the executive, at times, acts through administrative agencies to fulfill his constitutional obligation that the laws be faithfully executed.  Util. Air Regulatory Grp. v. E.P.A., 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President, acting at times through agencies . . . 'faithfully execute[s]' them." (quoted source omitted; alterations in original)); see also supra, ¶97.

¶130 With respect to the granting of power to administrative agencies, the Chief Justice mistakes the import

39

of our analysis in Martinez. There, we said "administrative agencies are creations of the legislature and . . . they can exercise only those powers granted by the legislature." Martinez, 165 Wis. 2d 20 at 697. From this the Chief Justice concludes that because agencies are created by the legislature they are subject to its plenary control. Chief Justice Roggensack's concurrence/dissent, ¶147. That, however, overlooks the fact that agencies exercise both executive and legislative powers. Our observations in Martinez related to the legislature's ability to govern the rule-making authority——that is, the legislative power——it delegates to administrative agencies. So our statements on the legislature's ability to limit the legislative authority the agencies exercise say nothing about its ability to limit the agencies' exercise of executive authority. Nor does the Chief Justice find any authority for the proposition that an agency's exercise of that executive authority arises from or is dependent on the legislature. The legislature undeniably has plenary authority to govern administrative agencies' exercise of their delegated rule-making power because the legislature could simply choose to revoke it altogether. Martinez, 165 Wis. 2d at 698. It naturally follows that if the legislature may eliminate the power it conferred, it may also condition the exercise of that power. Koschkee, 387 Wis. 2d 552, ¶20. But the legislature does not confer on administrative agencies the ability to exercise executive power; that comes by virtue of being part of the executive branch. The Chief Justice cites no authority nor

40

presents any argument suggesting the legislature's authority over an agency's exercise of legislative power is necessarily (or even potentially) co-extensive with its authority over an agency's exercise of executive power.

¶131 This is a dangerous path the Chief Justice is pursuing. The Wisconsin Constitution provides for a circuit court, but does not say how many circuit court judges there shall be. So the existence of any given circuit court judge is dependent entirely on the legislature's choice to create the position. The Chief Justice says the power to create includes the ability to control the exercise of authority in that position, even when the legislature is not the source of the authority the employee exercises. If that logic is sound, the legislature could tell circuit court judges how to exercise their judicial power on the grounds that it did not have to create the circuit court position in the first place and could eliminate it.

¶132 The Chief Justice also says the executive's authority to explain the law, or give guidance or advice about it, is not core to the executive:

> While the executive may interpret laws so that he can "faithfully execute" them, it does not follow that interpretation of the law is a constitutional core power of the executive. Many elected and appointed persons interpret the law in order to carry out their assigned duties, be they constitutional functions or otherwise.

Chief Justice Roggensack's concurrence/dissent, ¶137. In support, she quotes Justice Clarence Thomas, who said:

41

> [t]he judicial power was understood [at the time of the founding of the United States] to include the power to resolve ambiguities over time. Alexander Hamilton lauded this power, arguing that '[t]he interpretation of the laws is the proper and peculiar province of the courts.' It is undoubtedly true that the other branches of Government have the authority and obligation to interpret the law, but only the judicial interpretation would be considered authoritative in a judicial proceeding."

Id., ¶138 (quoting Perez, 575 U.S. at 119-20 (Thomas, J., concurring) (some alterations in original; internal citations omitted)). Justice Thomas, of course, was careful to note that the judiciary's interpretation of the law is authoritative "in a judicial proceeding." Perez, 575 U.S. at 120. He made no claim that our interpretation would be authoritative in the executive branch's determination of what the law requires. As Alexander Hamilton said: "He who is to execute the laws must first judge for himself of their meaning." See Hamilton, supra, ¶96 (emphasis added).

¶133 The question here is not whether the executive branch alone may interpret the law. The question is whether interpreting the law within the executive branch is an exercise core to the executive and his employees. The Chief Justice says this is a shared power, but does not indicate how that could possibly be. The general power to interpret the law is "shared" in the sense that each of the branches must perform that function while performing their vested responsibilities, but the Chief Justice does not explain how the interpretation of the law within the executive branch could be shared with any other branch. She simply concludes that "[i]f explaining what the law means through guidance documents actually were a constitutional

42

core power of the executive, courts could not strike down such an interpretation." Chief Justice Roggensack's concurrence/dissent, ¶154. But we don't strike down executive interpretations of the law. We strike down the executive's application of the law in specific cases. A guidance document is not an application of the law, it is simply the executive branch's understanding of what the law requires.[21]

¶134 Finally, the Chief Justice says that, "[e]ven though guidance documents do not have the force of law as rules of administrative agencies do, employees of agencies apply them to the public's interaction with the agency. Sometimes those interactions result in litigation when a person against whom a guidance document is being enforced objects to enforcement." Chief Justice Roggensack's concurrence/dissent, ¶141. She also cautions that "[g]uidance documents can have a practical effect similar to an unpromulgated rule," noting that "historically, administrative agencies have relied on guidance documents to circumvent rulemaking." Id., ¶¶142-43. Now that the

---

[21] The Chief Justice says we ignored State v. Unnamed Defendant, 150 Wis. 2d 352, 441 N.W.2d 696 (1989), as an example of the judiciary properly invading the executive's interpretation of the law. Chief Justice Roggensack's concurrence/dissent, ¶151. There, as the Chief Justice notes, "an acting district attorney concluded that he could not prove a sexual assault occurred beyond a reasonable doubt, and, therefore, decided not to commence criminal proceedings." Id. (citing Unnamed Defendant, 150 Wis. 2d at 356). We ultimately approved the circuit court's order authorizing issuance of a complaint under Wis. Stat. § 968.02(3). But this does not illustrate what the Chief Justice thinks it does. We didn't countermand the district attorney's interpretation of the law, we countermanded his exercise of discretion.

43

legislature has specifically defined a guidance document as something that cannot be a rule, impose any obligations, set no standards, or bind anyone, it is no longer even conceptually possible for them to be "applied" or "enforced" against a person in accordance with the law.  However, should an administrative employee treat a guidance document as a source of authority, that employee would be making a mistake, not defining the nature of a guidance document.  So although the Chief Justice accurately describes how guidance documents were used prior to adoption of 2017 Wis. Act 369, they may no longer be lawfully used in that manner.  We expect, as befits a co-equal branch of government, that executive branch employees will respect that change in the law.  But if they should mistakenly use them as before, their mistakes are subject to judicial review pursuant to §§ 65-71, as we explained above.  The Chief Justice's concern that executive branch employees will misuse guidance documents in the future is not a justification for allowing the legislature to overstep its constitutional boundaries in order to check those transgressions.  Procedural safeguards enacted by the legislature, even those that respond to the executive's historical misuse of guidance documents, must comport with the constitution.  Sections 33 and 38 do not.

## VI.  CONCLUSION

¶135 We affirm the circuit court's judgment that 2017 Wis. Act 369 § 33 (to the extent it addresses guidance documents) and § 38 are facially unconstitutional because they intrude on power the Wisconsin Constitution vests in the executive branch of

government.   However, we reverse the circuit court's judgment with respect to 2017 Wis. Act 369, §§ 31, 65-71, 104-05.

¶136 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring in part, dissenting in part).* I conclude that 2017 Wis. Act 369's regulation of guidance documents does not invade the executive's core powers. I write to point out the fundamental flaw that underlies Justice Kelly's reasoning and on which he bases his conclusion that "the creation and dissemination of guidance documents fall within the executive's core authority." Justice Kelly's majority op., ¶105.

¶137 The executive's constitutional core power is to "take care that the laws be faithfully executed." Wis. Const. art. V, § 4. Justice Kelly gets to the conclusion he seeks by adding interpretation of the law to Article V, § 4's core power of execution of the law. Justice Kelly's majority op., ¶¶105-06. While the executive may interpret laws so that he can "faithfully execute" them, it does not follow that interpretation of the law is a constitutional core power of the executive. Many elected and appointed persons interpret the law in order to carry out their assigned duties, be they constitutional functions or otherwise.

¶138 In judicial proceedings, interpretation of the law is the constitutional core power of the courts. Wis. Const. art. VII, § 2; State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110 ("It is, of course, a solemn obligation of the judiciary to faithfully give effect to the laws enacted by the legislature, and to do so requires a determination of statutory meaning."). When an executive's interpretation of a law has been challenged in

1

court, it is the court's interpretation that prevails, not the executive's. State v. Unnamed Defendant, 150 Wis. 2d 352, 360, 441 N.W.2d 696 (1989); see also Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 119-20 (2015) (Thomas, J., concurring) ("The judicial power was understood [at the time of the founding of the United States] to include the power to resolve these ambiguities over time. Alexander Hamilton lauded this power, arguing that '[t]he interpretation of the laws is the proper and peculiar province of the courts.' It is undoubtedly true that the other branches of Government have the authority and obligation to interpret the law, but only the judicial interpretation would be considered authoritative in a judicial proceeding." (Internal citations omitted.)).

¶139 Outside of judicial proceedings, interpreting the law is a power that is shared by many governmental actors, e.g., state executive agency employees, state legislative employees, county agency employees, court employees and municipal employees, to name only a few who must interpret the law in order to perform their functions. Martinez v. DILHR, 165 Wis. 2d 687, 696, 478 N.W.2d 582 (1992). Although the executive interprets laws, such interpretation does not convert a shared power into a constitutional core power of the executive. Rather, outside of court proceedings, interpreting the law remains a shared function. Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶140-41, 382 Wis. 2d 496, 914 N.W.2d 21 (Ziegler, J., concurring).

## I. BACKGROUND

¶140 2017 Wis. Act 369 has several provisions that affect guidance documents. Section 31 generally defines guidance documents; § 33 addresses required content of guidance documents; § 38 regulates creation of guidance documents and §§ 65-71 set out how litigation may proceed when guidance documents are at issue.[1] Justice Kelly has concerns with only §§ 33 and 38. Justice Kelly's majority op., ¶88. He has concluded that the other guidance document provisions are facially constitutional. Id.

## II. DISCUSSION

### A. The Remedial Nature of 2017 Wis. Act 369

¶141 Guidance documents explain agencies' interpretations of provisions in statutes and administrative agency rules. They explain how the agency that created the guidance document likely will apply the law, often giving factual examples in the guidance document. Guidance documents include such things as handbooks, "how to" instructions for meeting various agency requirements and many other suggestions for successful interactions with the agency. Even though guidance documents do not have the force of law as rules of administrative agencies do, employees of agencies apply them to the public's interaction with the agency. Sometimes those interactions result in litigation when a person against whom a guidance document is

---

[1] Sections 104-05 address the initial applicability and effective date of § 33.

3

being enforced objects to enforcement. Newcap, Inc. v. DHS, 2018 WI App 40, ¶3, 383 Wis. 2d 515, 916 N.W.2d 173.

¶142 Guidance documents can have a practical effect similar to an unpromulgated rule. To explain, "[a]gency guidance . . . can have similar effect to an enforcement action or regulation——imposing norms on regulated entities or the beneficiaries of regulatory programs. Moreover, the individual interests subject to agency guidance frequently are no less important than those interests regulated through administrative enforcement actions and regulations." Jessica Mantel, Procedural Safeguards for Agency Guidance: A Source of Legitimacy for the Administrative State, 61 Admin. L. Rev. 343, 345 (2009).

¶143 Given the rule-like practical effects of guidance documents, we should not be surprised that, historically, administrative agencies have relied on guidance documents to circumvent rulemaking. Andrew C. Cook, Extraordinary Session Laws: New Limits on Governor and Attorney General, 92 Wis. Law. 26, 27 (2019) (discussing the problem created when "guidance documents contain new interpretations that operate essentially as administrative rules but without going through the proper rulemaking process"); Written Testimony of Senator David Craig on Senate Bill 745 Before the Senate Committee on Labor and Regulatory Reform (Feb. 6, 2018), https://docs.legis. wisconsin.gov/misc/lc/hearing_testimony_and_materials/2017/sb745 /sb0745_2018_02_06.pdf (explaining that guidance documents have been used "to avoid the deliberative process of rulemaking")

4

(last visited June 25, 2020); Floor Speech by Andre Jacque Floor Session on 2017 Assembly Bill 1072 (2017 Wis. Act 369), at 3:25, https://wiseye.org/2018/12/05/assembly-floor-session-part-2-8/ (last visited June 25, 2020) (explaining the assemblyman "frequently heard from constituents, small businesses [and] local government" about "how guidance documents have been abused as a vehicle to actually change the law" and how they are sometimes "hidden from sight or dusted off after decades").

¶144 Wisconsin's troublesome history with guidance documents is not unique.[2] The D.C. Circuit summarized the problem well in 2000:

> The phenomenon we see in this case is familiar. Congress passes a broadly worded statute. The agency follows with regulations containing broad language, open-ended phrases, ambiguous standards and the like. Then as years pass, the agency issues circulars or guidance or memoranda, explaining, interpreting, defining and often expanding the commands in the regulations. One guidance document may yield another and then another and so on. Several words in a regulation may spawn hundreds of pages of text as the agency offers more and more detail regarding what its regulations demand of regulated entities. <u>Law is made, without notice and comment, without public participation, and without publication in the Federal Register of the Code of Federal Regulations.</u>

<u>Appalachian Power Co. v. E.P.A.</u>, 208 F.3d 1015, 1020 (D.C. Cir. 2000) (emphasis added).

---

[2] Hale Melnick, Comment, <u>Guidance Documents and Rules: Increasing Executive Accountability in the Regulatory World</u>, 44 B.C. Environmental Affairs L. Rev. 357, 364 (2017) ("By issuing guidance documents, agencies circumvent the costly and time-consuming——but democratically important——notice-and-comment requirements.").

¶145 Justice Kelly ignores the remedial nature of 2017 Wis. Act 369. He argues that "should an administrative agency employee treat a guidance document as a source of authority, that employee would be making a mistake, not defining the nature of a guidance document. . . . [T]heir mistakes are subject to judicial review." Justice Kelly's majority op., ¶134.

¶146 I cannot ignore the history that led to the enactment of 2017 Wis. Act 369 simply because judicial review is available. Recently, we explained that judicial review is, by itself, an inadequate protection against the deprivation of the people's liberty. Wis. Legislature v. Palm, 2020 WI 42, ¶¶32–35, 391 Wis. 2d 497, 942 N.W.2d 900. As we explained, "[j]udicial review does not prevent oppressive conduct from initially occurring." Id., ¶35. The legislature has a legitimate interest in providing effective procedural safeguards. Id. Justice Kelly should not be so quick to dismiss the history that led to the enactment of 2017 Wis. Act 369.

## B. Agencies

¶147 While agencies are part of the executive branch once established, it is the legislature that creates agencies and grants them "power as is necessary to carry into effect the general legislative purpose." Koschkee v. Taylor, 2019 WI 76, ¶12, 387 Wis. 2d 552, 929 N.W.2d 600. An administrative agency has only those powers as are expressly conferred by the statutory provisions under which it operates.[3] State ex rel.

---

[3] 2011 Wis. Act 21 affected the authority of agencies by imposing an "explicit authority requirement" on agency

Castaneda v. Welch, 2007 WI 103, ¶26, 303 Wis. 2d 570, 735 N.W.2d 131 (quoting Brown Cty. v. DHSS, 103 Wis. 2d 37, 43, 307 N.W.2d 247 (1981)); see also Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 56, 158 N.W.2d 306 (1968) ("The very existence of the administrative agency or director is dependent upon the will of the legislature; its or his powers, duties and scope of authority are fixed and circumscribed by the legislature and subject to legislative change."); Gray Well Drilling Co. v. Wis. State Bd. of Health, 263 Wis. 417, 419, 58 N.W.2d 64 (1953) (explaining that administrative agencies are not required to follow rules governing judicial proceedings unless a statute requires otherwise because "rules of procedure for administrative bodies" are a "function" that "belongs to the legislature"); State ex rel. Wis. Inspector Bureau v. Whitman, 196 Wis. 472, 508, 220 N.W. 929 (1928) ("[A]dministrative agencies are the creatures of the legislature and are responsible to it. Consequently the legislature may withdraw

---

authority. See generally Kirsten Koschnick, Comment, Making "Explicit Authority" Explicit: Deciphering Wis. Act 21's Prescriptions for Agency Rulemaking Authority, 2019 Wis. L. Rev. 993. This requirement is set out in Wis. Stat. § 227.10(2m), which provides:

> No agency may implement or enforce any standard, requirement, or threshold, . . . unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter[.]

Section 227.10(2m) clearly limits agency authority from what courts had held in the past. Wis. Legislature v. Palm, 2020 WI 42, ¶52, 391 Wis. 2d 497, 942 N.W.2d 900. Justice Kelly never mentions the explicit authority requirement of § 227.10(2m).

7

powers which have been granted, prescribe the procedure through which granted powers are to be exercised, and if necessary wipe out the agency entirely.").

¶148 I agree that separation of powers is a doctrine that is firmly established under Wisconsin law. Martinez, 165 Wis. 2d at 696 n.8 (explaining that the Wisconsin Constitution "art. IV., sec. 1 vests legislative power in the senate and assembly; art. V., sec. 1 vest[s] executive power in the governor and lieutenant governor; and art. VII, sec. 2 vest[s] judicial power in a unified court system"); see also Unnamed Defendant, 150 Wis. 2d at 360. However, administrative agencies have no constitutional core powers because they are not a branch of government in our tripartite system. Martinez, 165 Wis. 2d at 696 n.8. Stated otherwise, the core power of the executive resides with the governor and lieutenant governor; it does not reside with administrative agencies, which are merely "creatures of statute." Lake Beulah Mgmt. Dist. v. DNR, 2011 WI 54, ¶23, 335 Wis. 2d 47, 799 N.W.2d 73; see also Koschkee, 387 Wis. 2d 552, ¶47 (R. Grassl Bradley, J., concurring) ("Article V, Section 1 'vest[s]' the 'executive power . . . in a governor' . . . . These constitutional 'grants are exclusive,' which has been understood to mean 'only the vested recipient of that power can perform it.'" (alterations in the original) (internal citations omitted)).

¶149 Justice Kelly reasons that creating guidance documents is a core power of the executive because the power to create guidance documents does not come from the legislature: "[A]

guidance document is something created by the executive branch employees through the exercise of executive authority native to that branch of government." Justice Kelly's majority op., ¶105. Justice Kelly asserts that "unlike a rule, the executive branch needs no borrowed authority from the legislature to create a guidance document." Justice Kelly's majority op., ¶100. He asserts, "This creative power is necessarily inherent to the executive because no other branch of government has even the theoretical ability to know the executive's mind with respect to the law he is to execute." Justice Kelly's majority op., ¶102.

¶150 He cites no authority for this change in the law, which has repeatedly held that "administrative agencies are creations of the legislature and that they can exercise only those powers granted by the legislature." Martinez, 165 Wis. 2d at 697; see also Castaneda, 303 Wis. 2d 570, ¶26; Brown, 103 Wis. 2d at 43. As creatures of statute, the legislature may "prescribe the procedure through which granted powers [of administrative agencies] are to be exercised." Whitman, 196 Wis. at 508.

¶151 Justice Kelly also ignores our decision in Unnamed Defendant where an acting district attorney concluded that he could not prove a sexual assault occurred beyond a reasonable doubt, and, therefore, decided not to commence criminal proceedings. Unnamed Defendant, 150 Wis. 2d at 356. Notably, his conclusion occurred outside the context of a judicial proceeding, as most charging decisions do. Nevertheless, the circuit court ordered the district attorney or his designee to

file charges pursuant to Wis. Stat. § 968.02(3), which states a judge "may permit the filing of a complaint" in a John Doe proceeding "if the judge finds there is probable cause to believe that the person to be charged has committed an offense after conducting a hearing." Id. at 357. We upheld the circuit court's decision. Id. at 367. In so doing, we authorized circuit courts to disregard prosecutors' statutory interpretations in light of the "John Doe Law," Wis. Stat. §§ 968.02(3) and 968.26. Id. at 366. The interpretation of the acting district attorney would not have been overruled if interpretation of the law were a core power of the executive.

¶152 Justice Kelly ultimately concludes that the answer to whether the legislature can legislate in regard to guidance documents "depends on whether the creation of guidance documents represents an exercise of the executive's core function, or merely a power shared with the legislature." Justice Kelly's majority op., ¶103. To address this concern, he creates his own definition core powers: "A branch's core powers are those that define its essential attributes." Justice Kelly's majority op., ¶104. He acknowledges that if guidance documents fall within shared powers, the legislature may have the "right to govern their content and dissemination." Justice Kelly's majority op., ¶104. However, he does not give a moment's pause to shared powers, but rather, he opines that all of his legal contentions are "true because guidance documents merely explain statutes and rules, or provide guidance or advice about how the executive is likely to apply them." Justice Kelly's majority op., ¶106.

10

¶153 To explain shared powers, and their relationship to core powers, "it is neither possible nor practicable to categorize all governmental action as exclusively legislative, executive or judicial." Martinez, 165 Wis. 2d at 696 (quoting State v. Washington, 83 Wis. 2d 808, 825, 266 N.W.2d 597 (1978)). Therefore, separation of powers is transgressed only when one branch "interferes with a constitutionally guaranteed 'exclusive zone' of authority vested in another branch," Martinez, 165 Wis. 2d at 697, i.e., a constitutional core power, or when a shared power is unduly burdened. Flynn v. DOA, 216 Wis. 2d 521, 556, 576 N.W.2d 245 (1998).

¶154 If explaining what the law means through guidance documents actually were a constitutional core power of the executive, courts could not strike down such an interpretation. Yet courts have done so when an agency oversteps the authority granted by the legislature in reliance on the agency's interpretation of what the law requires. Newcap, 383 Wis. 2d 515, ¶3; Papa v. DHS, 2020 WI __, ¶2, __ Wis. 2d __, __ N.W.2d __.

¶155 Additionally, the legislature often interprets its own laws. In the case before us, members of the legislature would not have standing if the legislature had no power to interpret its laws. Yet Justice Kelly takes no issue with these members arguing before our court.

¶156 Justice Kelly also supports his legal conclusion with quotes from portions of Tetra Tech. For example, he says:

> The executive must certainly interpret and apply the law; it would be impossible to perform his duties if

11

> he did not. . . . Our constitution not only does not forbid this, it requires it.

Justice Kelly's majority op., ¶96 (citing Tetra Tech, 382 Wis. 2d 496, ¶53 (lead)). However, this paragraph of Tetra Tech was joined by only one justice in addition to Justice Kelly who wrote the provision; it does not represent the opinion of the court. Id., ¶3 n.4. Indeed, Justice Ziegler wrote a concurrence, which I joined, in part to respond to this portion of the lead opinion in Tetra Tech. Id., ¶141 & n.10 (Ziegler, J., concurring). She explained that "the power to interpret and apply the law" is a shared power outside the context of a judicial proceeding. Id., ¶¶140-41.

¶157 That an executive would interpret a law as he executes it does not convert interpretation of the law into a constitutional core power. Interpretation of the law is a shared power that many governmental actors employ as they interpret what they must do in order to be in compliance with the law. See e.g., State v. Horn, 226 Wis. 2d 637, 644-45, 594 N.W.2d 772 (1999) (discussing the shared power of administrative revocation of probation and the court's power to sentence); State v. Dums, 149 Wis. 2d 314, 323-24, 440 N.W.2d 814 (1989) (discussing the shared power to amend or dismiss a filed charge under the separation of powers doctrine).

¶158 A final note worth mentioning is the standard of review. Justice Kelly and I agree on the standard of review, although we apply it quite differently. He explains that, because this lawsuit is a facial challenge, we must uphold the

12

statutes unless they cannot be enforced under any circumstances. Justice Kelly's majority op., ¶92. He later states:

> [The legislature] may not control [the Governor's] knowledge or intentions about those laws. Nor may it mute or modulate the communication of his knowledge or intentions to the public. Because there are no set of facts pursuant to which §§ 33 (to the extent it applies to guidance documents) and 38 would not impermissibly interfere with the executive's exercise of his core constitutional power, they are in that respect facially unconstitutional.

Justice Kelly's majority op., ¶108.

¶159 There are a few issues with this application of the standard of review. First, I would not conflate administrative agencies with the governor as Justice Kelly does. The governor is a constitutional officer; administrative agencies are "creatures of statute." Lake Beulah, 335 Wis. 2d 47, ¶23.

¶160 Second, even if I were to assume, arguendo, that administrative agencies were equivalent to the governor, 2017 Wis. Act 369, §§ 33 & 38 do not "control" the governor's "knowledge or intentions." Justice Kelly's majority op., ¶108. Instead, they require administrative agencies to follow certain procedures. For example, agencies must "provide for a period for public comment on a proposed guidance document." Wis. Stat. § 227.112(1)(b). Public comments might inform the "knowledge or intentions" of the administrative agency; however, they would not control it. Justice Kelly rhetorically questions whether I would feel similarly if the legislature required the Wisconsin Supreme Court to submit its opinions to a public comment period before publication. No, I would not, because we are constitutional officers; administrative agencies are not.

13

¶161 Third, and relatedly, this case is not an as-applied challenge. In some situations, §§ 33 & 38 might contain procedural hurdles on the issuance of guidance documents that are so difficult to meet that they are unduly burdensome. However, we do not have an as-applied challenge before us.

¶162 Justice Kelly's conclusion is in error because his reasoning relies on a fundamentally inaccurate legal premise. Interpreting the law is a shared power, not a constitutional core power of the executive. As a shared power, it cannot be unduly burdened. Flynn, 216 Wis. 2d at 556. However, before us is a facial challenge, and the plaintiffs have not established that 2017 Wis. Act 369, §§ 33 & 38 are unduly burdensome in all circumstances. Accordingly, I respectfully concur with respect to the majority opinion on all issues except guidance documents, and I respectfully dissent from the majority opinion regarding guidance documents.

¶163 REBECCA FRANK DALLET, J. *(concurring in part, dissenting in part).* Just days before the swearing-in of Wisconsin's newly elected governor and attorney general, the legislature passed, and the outgoing governor signed into law, 2017 Wis. Act 369 and 2017 Wis. Act 370. The Plaintiffs, a group of labor organizations and individual taxpayers, filed this lawsuit alleging several provisions of these Acts violate the separation of powers enshrined in the Wisconsin Constitution.

¶164 I agree with the scope of the majority opinions[1] and join several parts.[2] I write separately, however, because the

---

[1] I agree the following provisions were not properly before the court on this interlocutory appeal: 2017 Wis. Act 369, § 87 (Wis. Stat. § 238.399(3)(am)), 2017 Wis. Act 370, § 10 (Wis. Stat. § 20.940), and 2017 Wis. Act 370, § 11 (Wis. Stat. § 49.175(2)(a)). See Justice Hagedorn's majority op., ¶24 n.9.

[2] Specifically, I join Justice Kelly's majority opinion with respect to 2017 Wis. Act 369, § 31 (Wis. Stat. § 227.01 (3m)), § 33 (Wis. Stat. § 227.05), § 38 (Wis. Stat. § 227.112), §§ 65-71 (amending Wis. Stat. § 227.40), and §§ 104-05 in full, and Justice Hagedorn's majority opinion on the following parts:

- Part II.E.1., insofar as it reverses the circuit court with respect to 2017 Wis. Act 369, § 5 (Wis. Stat. § 13.365) and § 97 (Wis. Stat. § 803.09(2m));

- Part II.E.2., "Capitol Security" provision, 2017 Wis. Act 369, § 16 (Wis. Stat. § 16.84(2m));

- Part II.E.3, "Multiple Suspensions of Administrative Rules" provision, 2017 Wis. Act 369, § 64 (Wis. Stat. § 227.26(2)(im)), in light of Martinez v. DILHR, 165 Wis. 2d 687, 478 N.W.2d 582 (1992); and

- Part II.E.4., "Agency Deference Provision," 2017 Wis. Act 369, § 35 (Wis. Stat. § 227.10(2g)), in light of Tetra Tech EC, Inc. v. DOR, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21.

complaint plausibly suggests that the sweep of the "Litigation Control" provisions, 2017 Wis. Act 369, § 26 (Wis. Stat. § 165.08(1)) and § 30 (Wis. Stat. § 165.25(6)(a)1.), violates our constitutional separation of powers because it unduly burdens and substantially interferes with executive power. Accordingly, I respectfully concur in part and dissent in part.

I

¶165 This case was snatched from the circuit court in its infancy, on the eve of the first trial on the challenged provisions.[3] Consequently, the facts have not been developed and the parties have not had the opportunity to amend their pleadings to conform to those facts.[4] The impact of the majority opinions is therefore limited, as is our review. Several undeveloped claims are remanded right back to the circuit court to proceed in the ordinary course of litigation. Even those claims dismissed by the majority will likely find their way back

---

Because I join the majority opinions with respect to 2017 Wis. Act 369, § 31 (Wis. Stat. § 227.01(3m)), § 64 (Wis. Stat. § 227.26(2)(im)), §§ 65-71 (amending Wis. Stat. § 227.40), and §§ 104-05, I would similarly vacate the circuit court's temporary injunction with respect to these sections.

[3] This court assumed jurisdiction over the Legislative Defendants' interlocutory appeal on June 11, 2019, staying all circuit court proceedings the day before the first part of the bifurcated trial was set to commence.

[4] A litigant's ability to amend the pleadings pursuant to Wis. Stat. § 802.09(1) is "liberally construed . . . so as to present the entire controversy providing the amendment does not unfairly deprive the opposing party of timely opportunity to meet the issue created by the amendment." Wiegel v. Sentry Indem. Co., 94 Wis. 2d 172, 184, 287 N.W.2d 796 (1980) (quoted source omitted).

to us after newly filed lawsuits result in the very development that this court's assumption of jurisdiction snuffed. This court's impatience did not allow the challenges to 2017 Wis. Act 369 and 2017 Wis. Act 370 to percolate and will prove to be an unfortunate waste of judicial resources.[5]

¶166 We have before us a limited review of the circuit court's denial of a motion to dismiss. "A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint." Voters with Facts v. City of Eau Claire, 2018 WI 63, ¶27, 382 Wis. 2d 1, 913 N.W.2d 131 (quoting Data Key Partners v. Permira Advisers LLC, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693). The legal sufficiency of a complaint, in turn, "depends on [the] substantive law that underlies the claim made because it is the substantive law that drives what facts must be pled." Id. (alteration in original) (quoting Data Key Partners, 356 Wis. 2d 665, ¶31).

¶167 Here, the underlying substantive law is this court's jurisprudence on the separation of powers under the Wisconsin Constitution, as well as the United States Supreme Court's jurisprudence regarding the separation of powers under the

---

[5] See, e.g., Richard A. Posner, The Federal Courts: Crisis and Reform 163 (1985) ("[A] difficult question is more likely to be answered correctly if it is allowed to engage the attention of different sets of judges deciding factually different cases than if it is answered finally by the first panel to consider it."); John Paul Stevens, Some Thoughts on Judicial Restraint, 66 Judicature 177, 183 (1982) ("The doctrine of judicial restraint teaches us that patience in the judicial resolution of conflicts may sometimes produce the most desirable result.").

United States Constitution.[6]  The Wisconsin Constitution establishes a tripartite state government whereby it vests the senate and assembly with the legislative power, Wis. Const. art. IV, § 1; the governor with the executive power, id., art. V, § 1; and the unified court system with the judicial power, id., art. VII, § 2.  "[N]o branch [is] subordinate to the other, no branch [may] arrogate to itself control over the other except as is provided by the constitution, and no branch [may] exercise the power committed by the constitution to another."  Koschkee v. Taylor, 2019 WI 76, ¶10, 387 Wis. 2d 552, 929 N.W.2d 600 (quoting State ex rel. Friedrich v. Cir. Ct. for Dane Cty., 192 Wis. 2d 1, 13, 531 N.W.2d 32 (1995) (per curiam)).

¶168 Despite this formal proscriptive language, our separation-of-powers doctrine at times embraces a functionalist approach:  "the doctrine envisions a system of separate branches sharing many powers while jealously guarding certain others, a system of 'separateness but interdependence, autonomy but reciprocity.'"  Friedrich, 192 Wis. 2d at 14 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952)).  Our doctrine distinguishes core powers that the Wisconsin Constitution exclusively vests in one of the branches from shared powers that "lie at the intersections of these exclusive core constitutional powers."  State v. Horn, 226 Wis. 2d 637,

---

[6] The "principles underlying the United States Constitution . . . 'inform our understanding of the separation of powers under the Wisconsin Constitution.'"  League of Women Voters of Wisconsin v. Evers, 2019 WI 75, ¶31, 387 Wis. 2d 511, 929 N.W.2d 209 (quoting Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384).

4

643, 594 N.W.2d 772 (1999). The core powers are "jealously guard[ed]," while branches with intersecting powers may exercise their shared authority so long as they do not "unduly burden or substantially interfere with another branch." Id. at 644.

¶169 This court's functionalist approach, however, is vulnerable to one branch's accretion of another's power in their shared zone of authority.[7] That vulnerability threatens our constitutional structure[8] and requires this court to vigorously apply the limiting principle in our shared-power analysis: the exercise of shared power cannot unduly burden or substantially interfere with a coequal branch's function. Mindful of this limiting principle, I turn to the Litigation Control provisions.

II

¶170 The complaint alleges that the Litigation Control provisions, 2017 Wis. Act 369, § 26 (Wis. Stat. § 165.08(1)) and § 30 (Wis. Stat. § 165.25(6)(a)1.), violate the separation-of-

---

[7] Justice Brennan, a prolific modern advocate of living constitutionalism and constitutional functionalism generally, adhered to a formal separation-of-powers philosophy because of this vulnerability. See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 859–62 (1986) (Brennan, J., dissenting) (reasoning that the Court's functional approach risked the "incremental erosion" of the separation between the branches "central to our constitutional scheme"); see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) (Brennan, J.).

[8] "While individual encroachments on the constitutional structure may appear harmless, at some point the structure will fail, and '[w]hen structure fails, liberty is always in peril.'" Ara Lovitt, Fight for Your Right to Litigate: Qui Tam, Article II, and the President, 49 Stan. L. Rev. 853, 866 (1997) (footnotes omitted) (quoting Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring)).

powers doctrine because they effectively eliminate executive power to settle civil litigation by enacting an overriding legislative veto. Prior to Act 369, executive branch officials could direct a civil prosecution to be compromised or discontinued. Act 369 amended § 165.08(1) to remove the executive branch's unilateral control by barring the attorney general from compromising or discontinuing a civil prosecution without prior "approval of a[] [legislative] intervenor" or, if there is no legislative intervenor, "only if the joint committee on finance approves the proposed plan [to compromise or discontinue]" the prosecution. (Emphasis added.) Further, pursuant to § 165.08(1) the attorney general can no longer concede "the unconstitutionality or other invalidity of a statute" or that "a statute violates or is preempted by federal law" without first receiving the approval of another legislative committee, the joint committee on legislative organization.

¶171 Similarly, Wis. Stat. § 165.25(6)(a)1. removes the executive branch's unilateral control by mandating legislative approval in cases where the attorney general defends the State of Wisconsin in a civil action for injunctive relief or where there is a proposed consent decree. Section 165.25(6)(a)1. dictates that the attorney general "may not compromise or settle the action without the approval of a[] [legislative] intervenor . . . or, if there is no intervenor, without first submitting a proposed plan to the joint committee on finance." (Emphasis added.) The attorney general may now only settle a case in defense of the State of Wisconsin with the committee's

approval, if the committee chooses to meet. And if the plan "concedes the unconstitutionality or other invalidity of a statute, facially or as applied, or concedes a statute violates or is preempted by federal law," section 165.25(6)(a)1. adds yet another layer of legislative control: "the approval of the joint committee on legislative organization" before the attorney general may even submit the plan. Collectively, the Litigation Control provisions make legislative officials the final arbiters over the attorney general's discretionary authority to resolve state-related litigation.

¶172 The question presented to this court is whether the Plaintiffs have sufficiently stated a claim that the sweep of the Litigation Control provisions "unduly burden[s] or substantially interfere[s] with" the executive branch's power to execute the law. Horn, 226 Wis. 2d at 645. It is indisputable that litigation is a tool of the executive branch for executing the law, see Buckley v. Valeo, 424 U.S. 1, 138 (1976) (per curiam),[9] and that removal of sufficient executive control over litigation can violate the constitution, see Morrison v. Olson, 487 U.S. 654, 685-96 (1988). However, the majority undertakes no substantive analysis of whether the Litigation Control provisions' removal of executive control over resolving litigation unduly burdens or substantially interferes with the

---

[9] "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President . . . that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" Buckley v. Valeo, 424 U.S. 1, 138 (1976) (per curiam) (quoting U.S. Const. art. II, § 3).

7

executive branch's function.  Instead, the majority mechanically applies a strict review standard for facial challenges and concludes that the Plaintiffs' challenge fails because the court can conceive of some unarticulated constitutional application of the Litigation Control provisions.

¶173 I dissent for two reasons.  First, the legislature does not have a constitutionally-vested "institutional interest as a represented party" in civil litigation resolution and the power of the purse cannot be understood so broadly as to permit substantial burdens on another branch's intersecting power.  Second, the majority's rigid application of a strict facial-challenge standard in this case achieves the exact opposite of judicial modesty.  Application of the overbreadth doctrine better safeguards the separation of powers established by the Wisconsin Constitution.

A

¶174 The majority's conception of the legislature's "institutional interest as a represented party," Justice Hagedorn's majority op., ¶67, is unsupported by the Wisconsin Constitution and creates a dangerously expansive ability for the legislature to unduly burden and substantially interfere with the other branches.[10]  The Wisconsin Constitution, like the

---

[10] If the legislature had an institutional interest such that it could arrogate the executive power to ensure its laws were upheld (or at least not conceded) in court, the legislature could also rely on this interest to enact the same controls on the judiciary's authority to declare its laws invalid, unconstitutional, or preempted by federal law.  Such a result is constitutionally suspect.

8

United States Constitution, does not contemplate an active role for the legislature in executing or in supervising the executive officers charged with executing the laws it enacts.[11] See Schuette v. Van De Hey, 205 Wis. 2d 475, 480-81, 556 N.W.2d 127, (Ct. App. 1996) ("Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them, or appoint the agents charged with the duty of such enforcement." (quoting 2A Eugene McQuillin, Municipal Corporations § 10.06 at 311 (3d ed. 1996))); see also Bowsher v. Synar, 478 U.S. 714, 722, 726 (1986). Justice Hagedorn's majority opinion fails to tie its concept of an institutional

---

[11] I do not contest that the legislature's institutional interest may permit it to intervene in litigation on its own branch's behalf. For this reason, I join Justice Hagedorn's opinion with respect to 2017 Wis. Act 369, § 5 (Wis. Stat. § 13.365) and § 97 (Wis. Stat. § 803.09(2m)).

I further emphasize that this concurrence/dissent should not be read to advance the position that the attorney general, as part of the executive branch, has the sole power to decide the litigation positions of other constitutional officers when those officers are named parties in a lawsuit. We have previously warned that such a practice "would give the attorney general breathtaking power" and "would potentially make the attorney general a gatekeeper for legal positions taken by constitutional officers, such as the governor or justices of this court sued in their official capacity." Koschkee v. Evers, 2018 WI 82, ¶13, 382 Wis. 2d 666, 913 N.W.2d 878 (per curiam).

Likewise, irrespective of Wis. Stat. § 14.11(2), when a conflict arises and the attorney general, as part of the executive branch, is unable to represent a named judicial party, it is the judicial branch rather than the executive branch that selects subsequent representation. See id., ¶13 n.3 (citing SCR 81.02(1)) (referring to "this court's practice of appointing counsel for a court, for judges sued in their official capacity . . . and for boards, commissions and committees appointed by the supreme court").

9

interest to any constitutional text. This is fatal to its argument because a separation-of-powers analysis begins and ends with the Wisconsin Constitution.

¶175 The other legislative power relied upon by the majority, the power of the purse, is found in the Wisconsin Constitution. Wis. Const. art. VIII, § 2 ("No money shall be paid out of the treasury except in pursuance of an appropriation by law."); see Justice Hagedorn's majority op., ¶68. The legislature's control of the purse strings, however, cannot be read so broadly that it allows the legislature to curtail the functions of another branch even in an area of shared authority.[12] See Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶4, 376 Wis. 2d 147, 897 N.W.2d 384 ("[N]either the legislature nor the executive nor the judiciary 'ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers.'" (quoting The Federalist No. 48, at 305 (James Madison) (Clinton Rossiter ed., 1961))). If it were so broad, the legislature could authorize itself to veto any function constitutionally assigned to the executive or judiciary because money is required to enforce the law and maintain a judiciary. Such an "overruling influence" over the other branches is not constitutionally tolerable.

---

[12] In fact, the Wisconsin legislature's constitutional "power of the purse" is substantially more constrained relative to other state and the federal constitutions because the Wisconsin Constitution grants the governor "coextensive" authority over appropriations legislation. Wis. Const. art. V, § 10(1)(b); State ex rel. Wis. Tel. Co. v. Henry, 218 Wis. 302, 315, 260 N.W. 486 (1935).

B

¶176 Even assuming the power of the purse gives the legislature a share of the power to resolve litigation, I do not agree with the majority's mechanical adherence to a strict "no set of circumstances" test for facial challenges.

¶177 The majority cites to United States v. Salerno, 481 U.S. 739, 745 (1987), for the standard that the challenging party "must establish that no set of circumstances exists under which the [challenged act] would be valid." See Justice Hagedorn's majority op., ¶40 n.12. However, this dicta from the Salerno case has been applied inconsistently by the United States Supreme Court depending upon the nature of the facial challenge. See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992) (adopting the undue burden test for facial challenges to state abortion laws); see also City of Chicago v. Morales, 527 U.S. 41, 55 n.22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation . . . ."); Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175 n.1 (1996) (mem.) (citing United States Supreme Court cases that did not apply the Salerno test to a facial challenge). Recognizing the United States Supreme Court's inconsistency with regard to facial challenges, this court has previously declined to apply the no set of circumstances test to an Establishment Clause challenge where there was no clear United States Supreme Court precedent for doing so. Jackson v. Benson, 218 Wis. 2d 835, 854 n.4, 578 N.W.2d 602 (1998); see

11

also State v. Konrath, 218 Wis. 2d 290, 305 n.15, 577 N.W.2d 601 (1998) ("[T]he United States Supreme Court has not consistently applied the 'no set of circumstances' language.").

¶178 The majority claims this test is nonetheless appropriate as an exercise of judicial modesty that will avoid judicial overstepping into the legislature's prerogative. However, the majority effectuates the exact opposite result. Instead of respecting the coequal branches, it forces the subverted branch, here the executive, to repeatedly vindicate its constitutionally delegated role through as-applied challenges. That litigation burden may itself be undue and substantially detracts from the time and resources that both branches should instead be directing toward their respective constitutional functions.

¶179 More distressingly, the piecemeal litigation invited by the majority means that the judiciary will have to engage in line-drawing that is effectively policy-making, a clear overstep of its constitutional role. The much narrower statutes enacted by other states demonstrate that it is for the legislature, not the judiciary, to determine a dollar threshold where the power of the purse is implicated. See Justice Hagedorn's majority op., ¶70. For example, the Connecticut legislature limited its involvement to settlements over $2,500,000. See Conn. Gen. Stat. Ann. § 3-125a(a) (2019). The Oklahoma legislature set a threshold of $250,000. See Okla. Stat. Ann. tit. 51 § 200A.1. (2019). In Utah, legislative approval only becomes mandatory for settlements that might cost more than $1,000,000 to

12

implement. Utah Code Ann. § 63G-10-202 (2018). In contrast, Wisconsin's legislature granted itself an unfettered veto power in <u>every</u> proposed settlement, compromise, or discontinuation of not only civil cases where the attorney general is defending the State of Wisconsin, but also where the executive is prosecuting the law. I fail to see the touted judicial modesty in an approach that will result in an exercise of judicial policy-making.

¶180 Instead, this court should determine whether the Litigation Control provisions substantially interfere with the function of the executive because of their unconstitutional overbreadth.[13] An overbreadth challenge is appropriate upon "specific reasons weighty enough to overcome our well-founded reticence" in entertaining facial challenges. <u>Sabri v. United States</u>, 541 U.S. 600, 609-10 (2004) (citing United States Supreme Court cases applying an overbreadth test to facial challenges in various substantive contexts). Indeed, the United States Supreme Court will evaluate a facial challenge alleging that a statute is unconstitutionally overbroad where "good reason" exists——generally where the statute may encumber a fundamental constitutional protection. <u>Id.</u>; see, e.g., <u>Aptheker v. U.S. Sec'y of State</u>, 378 U.S. 500, 515–517 (1964) (applying overbreadth to evaluate a facial challenge to a statute

---

[13] At oral argument, Attorney General Kaul and the Legislative Defendants debated the issue of whether analyzing this case as a traditional facial challenge was appropriate. My analysis stems from their debate.

13

affecting the right to travel because it is "a personal liberty protected by the Bill of Rights").

¶181 The United States Supreme Court's broader understanding of the overbreadth doctrine is instructive for this court, as we have not had the opportunity to address the overbreadth doctrine outside of the First Amendment context. See, e.g., State v. Stevenson, 2000 WI 71, 236 Wis. 2d 86, 613 N.W.2d 90; Konrath, 218 Wis. 2d 290. As we noted in Konrath, the limited use of the overbreadth doctrine is based on third-party standing concerns: a private party to whom a statute constitutionally applies could escape his or her deserved sanction because of the statute's unconstitutional application to parties not before the court. 218 Wis. 2d at 305. We tolerate this result and modify the rules of standing in the First Amendment context because of "the gravity of a 'chilling effect' that may cause others not before the court to refrain from constitutionally protected speech or expression." Stevenson, 236 Wis. 2d 86, ¶12 (quoted sources omitted).

¶182 Here, there is no third-party standing concern. The constitutional and unconstitutional applications of the Litigation Control provisions affect a single party: the attorney general. By assuming jurisdiction over this case, the court obtained jurisdiction over the only party that could be

14

affected by the requested declaratory and injunctive relief.[14] This eliminates the possibility for judicial overreach that standing is meant to moderate.

¶183 Additionally, application of the overbreadth doctrine in a separation of powers challenge such as this one would prevent the "incremental erosion" of our tripartite constitutional structure, a harm as grave as the chilling effect on protected speech in the First Amendment context.[15] See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 859-62 (1986) (Brennan, J., dissenting). With respect to the Litigation Controls provisions particularly, the overbreadth doctrine would alleviate the danger of the legislature's "selective enforcement" of its new veto power to discriminately force the executive to continue litigation no longer deemed to be in the public interest. Cf. Stevenson, 236 Wis. 2d 86, ¶13; see also Gabler, 376 Wis. 2d 147, ¶5 (warning that absent separation of powers the legislature could "first 'enact tyrannical laws' then 'execute them in a tyrannical manner.'"

---

[14] In other words, the facial remedy would be no broader than the as-applied remedy since the only potential as-applied challenger is currently under this court's jurisdiction. This renders the distinction between the two analytically meaningless. See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010) ("The distinction [between facial and as-applied challenges] . . . goes to the breadth of the remedy.").

[15] Incremental erosion "undermines the checks and balances . . . designed to promote governmental accountability and deter abuse." Panzer v. Doyle, 2004 WI 52, ¶52, 271 Wis. 2d 295, 680 N.W.2d 666, overruled on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408.

15

(quoting 1 Montesquieu, The Spirit of the Laws 151-52 (Oskar Piest et al. eds., Thomas Nugent trans., 1949) (1748))). It also would prevent "practically unbridled . . . discretion" in delaying or denying executive decision-making on how to best enforce the law. Cf. Stevenson, 236 Wis. 2d 86, ¶13.

¶184 Given the absence of third-party standing issues and the gravity of the harm alleged with respect to these provisions, there is "good reason" for this court to apply the overbreadth doctrine to the Litigation Control provisions,[16] consistent with the United States Supreme Court's approach. See Sabri, 541 U.S. at 609-10; see also Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321 (2000) (advocating that the review of a facial challenge should be evaluated on a "doctrine-by-doctrine basis" and guided by "the applicable substantive tests of constitutional validity").

¶185 In the context of a motion to dismiss review, this court's overbreadth inquiry is whether the Plaintiffs have stated a claim that the Litigation Control provisions sweep so broadly that they "unduly burden or substantially interfere with" the executive branch's power to execute the law. See Horn, 226 Wis. 2d at 644. We must accept as true the

---

[16] This conclusion might be true in all shared-powers analyses, but I leave that question for another time. I focus my application of the overbreadth doctrine on the Litigation Control provisions because, as compared to the other challenged provisions, only their sweeping grab of power could unduly burden or substantially interfere with the executive branch's function.

16

Plaintiffs' allegations that the Litigation Control provisions can: (1) prolong litigation deemed no longer in the public interest; (2) lock in public resources on those cases; (3) undermine the attorney general's leverage at settlement conferences by removing ultimate settlement authority; and (4) inhibit the executive's check on unconstitutional legislative action. See Voters with Facts, 382 Wis. 2d 1, ¶27 (quoting Data Key Partners, 356 Wis. 2d 665, ¶19).

¶186 To assess the burden on a branch of government, the concern is with "actual and substantial encroachments by one branch into the province of another, not theoretical divisions of power." Martinez v. DILHR, 165 Wis. 2d 687, 697, 478 N.W.2d 582 (1992) (quoting J.F. Ahern v. Bldg. Comm'n, 114 Wis. 2d 69, 104, 336 N.W.2d 679 (Ct. App. 1983)). The court has in previous cases relied upon affidavits and statistical analyses. See Friedrich, 192 Wis. 2d at 25-30 (relying on affidavits from judges and attorneys to assess burden to the judicial branch); State v. Holmes, 106 Wis. 2d 31, 70, 315 N.W.2d 703 (1982) (relying on statistical evidence to assess the burden on the judicial branch caused by the challenged statute). In this case, however, there has been no factual development as to the amount and types of cases the attorney general litigates, the types and frequency of resolutions pursued in those cases, or the kinds of burdens the Litigation Control provisions now impose on that litigation. Only after development of the facts can a court determine whether the sweep of the Litigation Control provisions unduly burdens or substantially interferes

17

with the attorney general's ability to execute the law through litigation.

¶187 I conclude that the complaint and the reasonable inferences drawn therefrom sufficiently states a claim that the sweep of the Litigation Control provisions will unduly burden or substantially interfere with the executive branch's power to execute the law through civil litigation. Accordingly, I would affirm the circuit court's denial of the motion to dismiss the Litigation Control provisions and remand the case to the circuit court to proceed through the ordinary course of litigation. The temporary injunction should be reinstated on remand because the circuit court did not erroneously exercise its discretion. Its written decision states the correct law, applies that law to the facts of record, and demonstrates a reasoned process in reaching its conclusion. See Thoma v. Vill. of Slinger, 2018 WI 45, ¶11, 381 Wis. 2d 311, 912 N.W.2d 56.

¶188 For the foregoing reasons, I respectfully concur in part and dissent in part.

¶189 I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence/dissent.

18

¶190 BRIAN HAGEDORN, J. *(concurring in part, dissenting in part).* In 2017 Wis. Act 369, the legislature defined a new category of formal or official executive branch documents and communications called "guidance documents." The legislature established certain requirements governing their contents, a process governing their issuance, and a procedure permitting their administrative and judicial challenge. The majority bases its declaration that two provisions are unconstitutional on this proposition: legislative governance over guidance documents regulates executive branch thought and therefore invades core executive power. Hence, it throws the constitutional penalty flag and declares as facially unconstitutional a statutory provision requiring that the law be cited in formal agency communications. It also declares a notice-and-comment period prior to the issuance of guidance documents facially unconstitutional.

¶191 The majority's thesis, however, is wrong on the facts and runs contrary to the plain language of the laws the legislature passed. This means its constitutional conclusion is similarly faulty. The court may assert it is upholding the separation of powers, but it is not. The powers exercised by the legislature here are properly within their province, at least on a facial challenge. Although the majority denies it, the majority takes these powers away based on the thinnest of foundations—its misguided determination that guidance documents regulate executive branch thought. This isn't what the statutes do, and every other error follows from this flawed wellspring.

1

Guidance documents regulate executive branch communications with the public——a permissible and longstanding area of legislative regulation. I would hold that all of the guidance document provisions survive a facial challenge.

## I. WHAT GUIDANCE DOCUMENTS ARE

¶192 My disagreement with the majority is not over the meaning of the constitution; we both embrace the same separation-of-powers principles. Rather, the majority's analytical error rests with its mistaken interpretation of what guidance documents are and what they do. Wis. Stat. § 227.01(3m).[1] The new statute affirms that guidance documents

---

[1] 2017 Wis. Act 369, § 31 created the following subsection:

(a) "Guidance document" means, except as provided in par. (b), any formal or official document or communication issued by an agency, including a manual, handbook, directive, or informational bulletin, that does any of the following:

1. Explains the agency's implementation of a statute or rule enforced or administered by the agency, including the current or proposed operating procedure of the agency.

2. Provides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency, if that guidance or advice is likely to apply to a class of persons similarly affected.

(b) "Guidance document" does not include any of the following:

1. A rule that has been promulgated and that is currently in effect or a proposed rule that is in the process of being promulgated.

are not rules; they do not have the force of law. Rather, guidance documents are "formal or official documents or communications issued by an agency" that either explain how an agency is implementing a rule, or provide guidance or advice on how the agency is likely to apply a statute or rule if it is

2. A standard adopted, or a statement of policy or interpretation made, whether preliminary or final, in the decision of a contested case, in a private letter ruling under s. 73.035, or in an agency decision upon or disposition of a particular matter as applied to a specific set of facts.

3. Any document or activity described in sub. (13) (a) to (zz), except that "guidance document" includes a pamphlet or other explanatory material described under sub. (13) (r) that otherwise satisfies the definition of "guidance document" under par. (a).

4. Any document that any statute specifically provides is not required to be promulgated as a rule.

5. A declaratory ruling issued under s. 227.41.

6. A pleading or brief filed in court by the state, an agency, or an agency official.

7. A letter or written legal advice of the department of justice or a formal or informal opinion of the attorney general, including an opinion issued under s. 165.015 (1).

8. Any document or communication for which a procedure for public input, other than that provided under s. 227.112 (1), is provided by law.

9. Any document or communication that is not subject to the right of inspection and copying under s. 19.35 (1).

Wis. Stat. § 227.01(3m) (2017-18).

All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

likely to apply to a class of persons similarly affected. § 227.01(3m)(a).

¶193 The statute contains some clue as to the type of communications being envisioned: "a manual, handbook, directive, or informational bulletin." Id. While this list is nonexclusive, these examples help us understand what is meant by "formal or official document[s] or communication[s]." Id. Not every agency communication is a guidance document, only formal or official communications that either are or are like manuals, handbooks, directives, or bulletins. See Schill v. Wis. Rapids School Dist., 2010 WI 86, ¶66, 327 Wis. 2d 572, 786 N.W.2d 177 (explaining that "general terms . . . may be defined by the other words and understood in the same general sense" under the interpretive canon of noscitur a sociis (a word is "known by its associates")).

¶194 The guidance document provisions undoubtedly reach far and wide into agency operations. Agencies regularly create informational documents to inform the public regarding a given area of law. These communications do not themselves carry the force of law; rather they explain the agency's understanding and execution of the law to the public. The Plaintiffs and the Governor provided the following examples of guidance documents:

- A pamphlet issued by the Department of Public Instruction explaining how the department administers funding;

- A Department of Health Services guide about health insurance;

- A bulletin from the Division of Motor Vehicles about driver's license exams; and

4

- Forms created by the Department of Children and Families explaining eligibility for child support.

These are, in the main, ordinary sorts of official communications that greatly affect the public's knowledge of the laws that govern them.

¶195 This newly defined category of communications comes with new statutory requirements. Of particular moment are the two provisions receiving the court's disapproval. Wisconsin Stat. § 227.05 states that agencies "shall identify the applicable provision of federal law or the applicable state statutory or administrative code provision that supports any statement or interpretation of law that the agency makes in any publication." And Wis. Stat. § 227.112 requires, among other things, that proposed guidance documents be sent to the legislative reference bureau and undergo a notice-and-comment period before the guidance documents are issued, subject to the caveat that public comment periods shorter than 21 days are allowed with the governor's approval.[2]

## II. ANALYSIS

¶196 I refer the reader to the discussion of the separation of powers in the majority opinion analyzing the remaining issues in this case. Justice Hagedorn's majority op., ¶¶30-35. But by way of reminder, a core power is one conferred by the constitution such that only the branch vested with a core power

---

[2] Wisconsin Stat. § 227.112 is cited in full in paragraph 90 of Justice Kelly's majority opinion.

5

may exercise that power. See State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999); Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶48, 382 Wis. 2d 496, 914 N.W.2d 21 (Kelly, J.). Not all government power has this exclusive character. Shared powers, those residing where the powers of the branches converge, may be exercised by more than one branch so long as no branch "unduly burden[s] or substantially interferes[s] with another branch." Horn, 226 Wis. 2d at 643-44.

¶197 The Plaintiffs and the Governor argue that all of the guidance document provisions impermissibly infringe on a core executive power——namely, the Governor's constitutional duty to "take care that the laws be faithfully executed." Wis. Const. art. V, § 4. This occurs, the parties contend, because the legislature is regulating non-legislative power——the power to give advice, for example. The majority agrees in part and holds that two of the guidance document provisions intrude upon the core powers of the executive branch.[3]

¶198 The challenged provisions do not intrude upon the core powers of the executive branch because determining the content and timing of executive branch communications are not the exclusive prerogative of the executive. By enacting the guidance document provisions, the legislature is carrying out

---

[3] In the alternative, the Plaintiffs and the Governor assert that the guidance document provisions unduly burden and substantially interfere with the Governor's ability to faithfully execute the laws under a shared powers analysis. I conclude that all of the disputed guidance document provisions survive a facial challenge under both a core powers and shared powers analysis. But in light of the majority's decision, a separate analysis regarding shared powers is unnecessary.

6

its function of determining what the law should be by passing laws pursuant to its constitutional authority.  Wis. Const. art. IV, § 1, § 17; Koschkee v. Taylor, 2019 WI 76, 387 Wis. 2d 552, 929 N.W.2d 600 (stating legislative power "is the authority to make laws").  And nothing in the constitution suggests the legislature cannot, at least in some circumstances, make laws that determine the content of certain formal communications from the government to the public, or prescribe the process by which certain formal or official documents and communications are finalized and issued.

¶199 The legislature has long regulated at least some formal executive branch communications about the law——including the executive branch's understanding of what the law is, how the executive branch is executing the law, and how the executive branch intends to execute the law going forward.  The clearest example may be the mandatory creation of certain executive branch reports.  For instance, Wis. Stat. § 15.04(1)(d) requires executive agencies to create a report each biennium, delivered "[o]n or before October 15 of each odd-numbered year."  The report must include what the agency has done, how it operates, and its goals and objectives moving forward.  Id.  Similar

7

mandated reports regarding what the executive branch is doing and plans to do are found throughout Wisconsin law.[4]

¶200 In short, while the formal delineation of a category of executive branch communications called guidance documents are something new in state law, they are not new in kind. Here, the

---

[4] For example, the Read to Lead Development Council, a subordinate of the Department of Children and Families, annually submits an operation report to appropriate standing committees of the legislature. Wisconsin Blue Book 194 (2019-20). Likewise, the Board on Aging and Long-Term Care reports to both the governor and the legislature regarding "long-term care for the aged and disabled." Id. at 184. And the Farmland Advisory Council, a subordinate council of the Department of Revenue, is also required to report annually to the legislature. Id. at 226.

Sometimes the legislature is quite specific in directing the content of formal communications and the internal operations and decision-making processes in the executive branch. One example is the groundwater coordinating council, found in Wis. Stat. § 15.347(13). This statutory provision not only creates the council and its membership, it also details with particularity how often and under what conditions it can meet. § 15.347(13)(f) ("The council shall meet at least twice each year and may meet at other times on the call of 3 of its members."). The legislature has further mandated that the council must file a report every August

> which summarizes the operations and activities of the council during the fiscal year concluded on the preceding June 30, describes the state of the groundwater resource and its management and sets forth the recommendations of the council. The annual report shall include a description of the current groundwater quality in the state, an assessment of groundwater management programs, information on the implementation of [Wis. Stat.] ch. 160 and a list and description of current and anticipated groundwater problems. In each annual report, the council shall include the dissents of any council member to the activities and recommendations of the council.

§ 15.347(13)(g).

legislature has passed laws telling the executive branch what content must be included in certain communications, how those communications must be issued, and the process by which those communications may be challenged. This has never been thought of as a power exclusive to the executive, and nothing in the constitution makes it so. The constitution gives the legislature the power to say what the law should be. At the very least, this gives the legislature a say in at least some formal executive branch communications to the public about the law. The challenged provisions therefore should survive a facial challenge.

¶201 The majority disagrees and concludes Wis. Stat. §§ 227.05 and 227.112 violate the core powers of the executive branch. Its analysis falls far short of the mark because it rests on a singular proposition that finds no support in the statutory provisions at issue, and therefore has no basis in the constitution.

¶202 The majority summarizes its reasoning and conclusion as follows:

> Thought must precede action, of course, and guidance documents are simply the written record of the executive's thoughts about the law and its execution. They contain the executive's interpretation of the laws, his judgment about what the laws require him to do. Because this intellectual homework is indispensable to the duty to "take care that the laws be faithfully executed," Wis. Const. art. V, § 4, it is also inseparable from the executive's constitutionally-vested power.

Justice Kelly's op., ¶106.

¶203 This conclusion, however, does not follow from the premises because the guidance document provisions do not control or regulate executive branch thought, at least in all circumstances. That is the hook upon which the majority's entire analysis rests, and it is mistaken. The only thing the legislature purports to regulate here is a "formal or official document or communication" about the law——in other words, formal communications reflecting the product of thought. Wis. Stat. § 227.01(3m)(a). The majority's explanation that the legislature is regulating "the necessary predicate to executing the law," Justice Kelly's op., ¶107, is wrong on the facts, and therefore, wrong on the law. The legislature is regulating formal communications that are the result of, rather than the necessary predicate to, executing the law. By the time a guidance document has been reduced to writing, the thinking and analyzing has been done.

¶204 It is true that an executive branch document explaining when fishing season starts will require the executive branch to read and think about the law. But there's nothing core to the executive branch's powers in disseminating formal information which answers that legislatively determined question. Indeed, under our constitutional structure, it must be the executive that formally disseminates that information; that is the branch that executes the law, which necessarily

10

includes communication about the law.[5]  The majority's abstract approach misses what's actually going on here.  The legislature is not invading the executive's ability to read the law or think about the law when it regulates how agencies officially communicate to the public about what the law is and where in the statutes the law may be found.

¶205 The majority realizes, of course, that the legislature can tell the executive branch to communicate on a topic and can specify what the communication must include.  Justice Kelly's op., ¶¶122-23.  But such a communication, the majority tells us, does not meet the statutory definition of a guidance document. The majority explains:

> [I]f the legislature can "determine the content" of a guidance document, then it is no longer the executive's explanation, or the executive's guidance or advice——it is the legislature's explanation, guidance or advice.  So, to the extent the legislature commands production of a document, or determines the content of a guidance document, it simply is no longer a guidance document.

Id., ¶122.

---

[5] The majority raises a series of questions asking whether the legislature could tell the judicial branch to do similar things as the disputed laws do here.  Justice Kelly's op., ¶126. But the legislature's relationship to the judiciary is far different than its relationship to the branch charged with the constitutional duty to execute the laws the legislature passes. Moreover, the majority's criticisms ring hollow because the majority says the legislature can pass laws that do the very things it cites; the legislature just has to enact laws regarding specific documents (create a youth hunting bulletin, for example).  So the majority's criticisms apply just as forcefully to its own reasoning, which is to say, not much at all.

11

¶206 Nothing in the statutes, however, supports this conclusion. If the law commands that a manual be created reflecting the executive's understanding and intended application of the law——and the statutes are full of such mandates——by definition, the manual will reflect the executive's understanding and intended application of the law. The "authorship," as the majority calls it, doesn't change one bit. For example, if an executive agency must by legislative command create a youth hunting bulletin and cite the relevant law, this is a reflection of the executive branch's understanding of the law no less than if the executive chooses to do the same thing in the absence of such a command.

¶207 Moreover, the statutory definition of guidance documents contains strong internal clues that the majority's analysis is unsound. The law tells us guidance documents include manuals, handbooks, or informational bulletins. Wis. Stat. § 227.01(3m)(a). These have lay definitions, but they also appear as terms of art throughout our statutes to describe formal agency communications. Sometimes our law requires the creation of specific informational communications. See, e.g., Wis. Stat. § 7.08(3) (instructing the Elections Commission to create an election law manual); Wis. Stat. § 49.32(3) (instructing the Department of Health Services (DHS) to create a policy and procedural manual regarding aid to families with dependent children); Wis. Stat. § 73.03(57) (instructing the Department of Revenue to create a tax increment financing manual); Wis. Stat. § 84.02(4)(e) (instructing the Department of

12

Transportation (DOT) to create a <u>manual</u> establishing uniform traffic control devices); Wis. Stat. § 108.14(23) (instructing the Department of Workforce to create an unemployment insurance <u>handbook</u>). And at other times the statutes authorize, rather than command, the creation of informational communications. <u>See, e.g.,</u> Wis. Stat. § 84.01(11) (instructing that the DOT shall issue <u>bulletins</u>, pamphlets and literature as necessary); Wis. Stat. § 115.28(4) (instructing the State Superintendent of Public Instruction to create informational <u>bulletins</u>); Wis. Stat. § 452.05(2) (authorizing the Real Estate Examining Board to prepare informational letters and <u>bulletins</u>); Wis. Stat. § 458.03(2) (authorizing the Department of Safety and Professional Services to create informational letters and <u>bulletins</u>).

¶208 It would be extraordinarily odd to read the use of terms like manual, handbook, and bulletin in the definition of a guidance document to exclude nearly all other statutory uses of the terms "manual," "handbook," and "bulletin." That's not normally how we do statutory interpretation. <u>Bank Mut. v. S.J. Boyer Constr., Inc.</u>, 2010 WI 74, ¶31, 326 Wis. 2d 521, 785 N.W.2d 462 ("When the same term is used throughout a chapter of the statutes, it is a reasonable deduction that the legislature intended that the term possess an identical meaning each time it appears." (citation omitted)).

¶209 The majority's mistaken interpretation also produces results at odds with other portions of the definition of guidance documents. Under the majority's reasoning, the

13

optional creation of a manual by the executive branch is a guidance document, while the mandatory creation of that same manual containing the same thoughts and written by the same authors is not a guidance document. But both a legislative command to communicate and legislative permission to communicate fall well within the statutory language that a guidance document "[e]xplains the agency's implementation of a statute or rule enforced or administered by the agency" or "[p]rovides guidance or advice with respect to how the agency is likely to apply a statute or rule enforced or administered by the agency." Wis. Stat. § 227.01(3m)(a). The majority's approach to authorship does not square with the words the legislature wrote.

¶210 The two provisions the majority opinion strikes down should easily survive a facial challenge. Wisconsin Stat. § 227.05 requires that a guidance document cite the applicable laws. But the majority opinion holds that this is too much for the legislature to demand of the executive branch because it controls executive branch thought. Again, the majority's analysis is not grounded in the constitution, but in its misinterpretation of the statutes. The legislature can, at least sometimes, command the executive branch to cite the legal basis for its formal explanation of laws.

¶211 Similarly, Wis. Stat. § 227.112 mandates draft guidance documents be posted for 21 days before they are officially issued, among other related requirements. Posting a draft before issuance of some formal communications is now denominated a regulation of executive branch thought and invades

14

core executive power. The majority's reasoning is likewise rooted in its notion of authorship that runs counter to the statutory language. Again, the constitution allows the legislature to regulate the process by which at least some formal executive branch communications are issued. The majority agrees the legislature may do this if it commands the creation of such documents, but says the legislature may not do this if it merely permits the creation of such documents. Nothing in the statutes or the constitution suggests such a distinction.[6]

### III. CONCLUSION

¶212 I part ways with the majority not in the general constitutional principles at stake, but in the majority's erroneous interpretation of what guidance documents are under

---

[6] As the majority notes, Wis. Stat. § 227.05 was not challenged by the Plaintiffs; it was raised in the Governor's motion for a temporary injunction. Therefore, the underlying merits are not before us, only the motion for temporary injunction. Rather than conduct an analysis under the rubric we have established for reviewing temporary injunctions, the majority goes right to the merits and decides the legal claim. The majority could have determined the claim is likely to be successful, and gone on to analyze the remaining factors. That is ordinarily how a claim under this posture would be analyzed since the legal question presented here relates only to the temporary injunction, not to the legal claim in the case itself.

I also observe that even if the circuit court appropriately granted the temporary injunction, as the majority opinion concludes, the Legislative Defendants should still be able to raise their affirmative defenses on remand, including their claim that the governor does not have standing to sue the legislature on this question. The Legislative Defendants did not waive any opportunity to brief that question in the circuit court on remand given the question now before us relates only to the temporary injunction.

15

the laws the legislature passed.  The majority's criticisms and constitutional conclusion all derive from this error.  The unfortunate result is that the court's decision undermines, rather than protects, the separation of powers by removing power the people gave to the legislature through their constitution.  I would have directed the circuit court to grant the motion to dismiss the facial challenge to all the guidance document provisions challenged here and vacated the order enjoining these provisions in full.

¶213 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

16